UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

HRIBAR TRANSPORT, LLC,
a Wisconsin limited liability company,

               Plaintiff,

    v.                                      Case No. 20-cv-01255-PP

MICHAEL SLEGERS,

               Defendant.

---

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

## <u>INTRODUCTION</u>

Plaintiff, Hribar Transport, LLC (Hribar Transport), seeks to restrain the trade of Defendant, Michael Slegers (Slegers), and recover damages from Slegers for his purported breach of a non-compete provision. For a litany of reasons, Plaintiff's claim fails as a matter of law.

First, Slegers was not subject to a non-compete at the time of his departure. While Slegers was employed by Hribar Transport (with a non-compete provision) in 2018, his employment agreement with Hribar Transport was superseded by new terms of employment in 2019 with Hribar Logistics, LLC (Hribar Logistics), a separate and distinct entity. These new terms replaced his employment terms and non-compete with Plaintiff; Hribar Logistics' Human Resources Department noted as much upon Slegers' departure.

Second, the non-compete provision upon which Plaintiff relies is, as a matter of law, unenforceable as it: (i) unreasonably restricts Slegers from working for any competitor in any fashion, (ii) precludes Slegers from soliciting customers with whom he never had contact, (iii) contains ambiguous and undefined terms that make interpretation of restricted activities

impossible, and (iv) precludes Slegers from working with any motor carrier in eleven states without regard to the protectible interests of Hribar Transport.

Third, Plaintiff cannot prove the necessary elements of breach, causation, and damages. The undisputed evidence demonstrates that Slegers did not breach the non-compete provision by working with a competitor or soliciting customers. Indeed, customer depositions in this case detail that any decreased business with Hribar Transport was a result of (a) poor customer service by Hribar Transport, (b) Hribar Transport's lack of capacity, (c) strategic decisions by Hribar Transport to shift customers and business emphasis, (d) decreases in available shipments due to environmental regulations, or (e) a combination of these factors. Simply, Plaintiff cannot show that any alleged breach of the (inactive) non-compete caused Hribar Transport's alleged woes. Equally detrimental is that Plaintiff cannot prove that it has suffered damages at all. Since Slegers' departure, Hribar Transport has actually become more profitable. Plaintiff's expert provides no relief because he admits he is unable to isolate damages incurred by Hribar Transport alone, the sole Plaintiff in this case.

For each of these reasons, summary judgment on Plaintiff's breach of contract claim is proper.

<p style="text-align:center;">**STATEMENT OF UNDISPUTED MATERIAL FACTS**</p>

**A.      In 2011, Slegers Sold His Business to Amston Supply and Executed an Employment Agreement With Hribar Transport.**

For years, Slegers owned and operated a transportation company called MCS Trucking, Inc. (MCS Trucking) and a truck leasing company called SWI Leasing, Inc. (SWI Leasing). (DPFOF 1.)[1] MCS Trucking was a trucking company that provided transportation services to shippers, primarily those requiring pneumatic transportation (*e.g.*, specialized trailers that can haul

---

[1] Defendant refers to citations in its contemporaneously filed Defendant's Proposed Findings of Fact as "DPFOF __".

dry bulk goods such as cement fly ash). (DPFOF 2.) Around 2011, Steven Hribar met with Slegers to discuss the sale of MCS Trucking and SWI Leasing, and the parties ultimately agreed to a deal that was formalized on December 9, 2011. (DPFOF 3.) Amston Supply, Inc. (Amston) – the asset holding company for the Hribar entities – agreed to purchase the assets of MCS Trucking and SWI Leasing as a part of the asset purchase agreement. (DPFOF 4.) Separately, on the same date, Slegers executed an Employment Agreement with Hribar Transport. (DPFOF 5.) Slegers joined Hribar Transport as the Director of Indiana Sales and Operations. (DPFOF 6.)[2] This meant that he would "perform duties as are assigned to him by [Hribar Transport], including terminal manager, transitioning the customer base of MCS Trucking, Inc. to Hribar Transport and servicing such customers..." (DPFOF 7.) The 2011 employment agreement provided an employment term that "may be extended upon mutual written agreement of the parties." (DPFOF 8.) The agreement also contained a non-compete provision. (DPFOF 9.)

The parties did not extend the 2011 employment agreement, opting instead to replace it with a new employment agreement which was executed on February 28, 2013. (DPFOF 10.) The agreement contained a similar non-compete provision. (DPFOF 11.) Like the previous one, the 2013 employment agreement authorized an extension of the employment term "upon mutual written agreement of the parties." (DPFOF 12.) The 2013 employment agreement provided for similar compensation and similar duties as Slegers' initial agreement. (DPFOF 13.)

The parties did not extend the 2013 employment agreement. (DPFOF 14.) Instead, like before, Hribar Transport and Slegers executed a new replacement employment agreement with an effective date of January 1, 2014 (2014 Employment Agreement).[3] (DPFOF 15.) Under this

---

[2] An Employee Data Sheet for Mike Slegers indicates that he was an "Employee" of "INDY-Hribar Transport LLC." (DPFOF 17.)

[3] The 2014 Employment Agreement shall be "governed by and construed and interpreted" under Indiana law. (DPFOF 16.)

agreement, Slegers was to be paid a base salary of $150,000. (DPFOF 18.) "[T]he employment term" was to "continue until January 1, 2019" but "[t]he term may be extended upon mutual written agreement of the parties." (DPFOF 19). Also, the 2014 Employment Agreement contained a non-compete provision stating in part:

> 8. Agreement Not to Compete
>
> (a) The Employee acknowledges that the Company's business and customer contacts are established and maintained at great expense and that the Employee would be able to compete unfairly with the Company unless the Employee is subject to the restrictions contained herein. As a result, the Employee agrees to the restrictions set forth below and shall not, during the term of the Employment Agreement and for a period of two (2) years thereafter:
>
>> (1) Acquire an ownership interest in, work for, render advice or assistance to or otherwise engage in or enter into any aspects of the business of any "Competitor" (as defined below); or
>>
>> (2) Contact, solicit or entice, or attempt to contact, solicit or entice, any "Customer" of the Business so as to cause, or attempt to cause, any of said Customers not to do business with the Buyer or to purchase services sold by the Buyer from any source other than the Buyer; or
>>
>> (3) Perform any trucking, hauling or transportation services for a Customer.

(DPFOF 20.) The agreement defines "Customer" as "those persons or entities to whom Employee or the Company provided services during the term of the Employment Agreement." (DPFOF 21.) "Competitor" is defined as "any business, incorporated or otherwise, which provides trucking services in the states of Indiana, Illinois, Wisconsin, Michigan, Ohio, Tennessee, Pennsylvania, New York, West Virginia, Kentucky and Missouri." (DPFOF 22.) The 2014 Employment Agreement is silent on definitions for "Business," "Buyer," "transportation services," or "trucking services." (DPFOF 23.)

**B.    In Late December 2018, Hribar Logistics Employs Slegers For a New Non-Contract Position With Differing Compensation and Benefit Structures.**

As the end of Slegers' employment term under the 2014 Employment Agreement approached, the parties began discussing the terms of his employment on a go-forward basis. (DPFOF 24.) As part of these conversations, Slegers was told that "Hribar had no interest in renewing the contract" and that he would become "a regular employee [] like everybody else." (DPFOF 25.) Slegers thought this meant that he would then be working for Hribar Logistics,[4] not Hribar Transport. (DPFOF 26.)[5] On December 27, 2018 – five days before the expiration of his employment term – Slegers was sent a letter from Hribar Logistics dictating his new pay structure and benefits package effective December 30, 2018. (DPFOF 27.) He was given a title of Director of Sales and Business Development and would conduct business with a Hribar Logistics email address and signature line. (DPFOF 28, 79.) Slegers signed the Hribar Logistics letter the next day. (DPFOF 29.) The letter did not contain a non-compete provision and had no language regarding a supposed "extension" of the 2014 Employment Agreement. (DPFOF 30.)

Around this time, the Hribar Entities began rolling out standalone non-compete agreements – as opposed to non-compete provisions within employment agreements – that were to be executed at the time employees received their bonus. (DPFOF 31.) Lucas LeMaster of Hribar Logistics had conversations with Steven Hribar and Sandy Jones (Human Resources) "about getting a non-solicit/non-compete in place [for Slegers] because [Slegers] could be a threat to [the] business

---

[4] Hribar Transport, Hribar Logistics, and Amston, along with Hribar Bros., Inc. and Hribar Trucking, Inc. (Hribar Entities), are separate entities that share common ownership. (DPFOF 34.) Hribar Bros. utilizes independent owner-operators to transport freight. (DPFOF 35.) Hribar Transport is a motor carrier that utilizes employee-drivers. (DPFOF 36.) Hribar Logistics is a freight broker that arranges for transportation of freight. (DPFOF 38.) The customer relationships for the Hribar Entities are maintained by Hribar Logistics. (DPFOF 40.) In reality, the relationship among the Hribar Entities is muddled, and Jeff Schultz, Hribar Transport's former Operations Manager, described the Hribar Entities' structure as "a circus." (DPFOF 41.)

[5] Slegers' assumption of working for Hribar Logistics is borne out by the fact that, after the December 2018 letter, he was compensated by Hribar Logistics, Inc. (DPFOF 42.) However, Slegers' Employee Data Sheet (and COBRA information) indicate that he was employed by Amston. (DPFOF 43.) Stunningly, Steven Hribar does not know if there was a change in employer, nor does he know by whom Slegers was employed. (DPFOF 44.)

without that." (DPFOF 32.) LeMaster admitted it was "bad business" not to have a non-compete in place. (DPFOF 33.)

Accordingly, in early 2019, Hribar Logistics presented Slegers with a draft standalone non-compete agreement. (DPFOF 45.) LeMaster attempted to get Slegers to sign this standalone non-compete "a couple of times." (DPFOF 46.) Instead of signing it, Slegers countered by adding a provision for additional consideration upon termination if the non-compete was triggered. (DPFOF 47.) The agreement was never fully executed by the parties. (DPFOF 48.) Slegers never signed another non-compete provision (or employment agreement) with Hribar Transport or any other Hribar entity. (DPFOF 49.)

## C. Around This Time, New Management at the Hribar Entities Shifted Business Strategies.

In late 2018 and early 2019, the Hribar Entities witnessed a "significant amount of turnover" of key roles. (DPFOF 51.) On December 31, 2018, Jeff Schultz, Hribar Transport's Operations Manager, resigned due to waning credibility in the industry because "[t]he service Hribar provided to their customers was awful" and "quite often trucks would not show up on the job sites" and would cause property damage on the sites. (DPFOF 52.) Later, Andy Smith, Slegers' former supervisor, resigned. (DPFOF 53.) As a result, Slegers began reporting directly to LeMaster. (DPFOF 54.)

This change of guard spurred a shift in strategy. LeMaster, the new vice president of the transportation group at Hribar Logistics, came on board to revamp business across the entities. (DPFOF 55.) The growth plan was multifold.

First, LeMaster wanted to jump start Hribar Logistics' freight brokerage.[6] (DPFOF 56.) The idea was that freight brokerage was more profitable, less fraught with issues, and untethered to equipment and personnel requirements. (DPFOF 57.)

Second, the Hribar Entities shifted customer targets to "[d]iversify from current customers." (DPFOF 58.) For example, concerns about too much reliance on LaFarge – Hribar Entities' largest customer – spurred a "conscious decision" to decrease business with it and seek alternative customers. (DPFOF 59.) The Hribar Entities sought to fill the void by cold calling customers and trying to solicit new business to avoid being "dependent on one person." (DPFOF 61.)

Third, the Hribar Entities "wanted to get into some more van work[7] and open-deck flatbed work" instead of focusing on pneumatic freight,[8] Slegers' specialty. (DPFOF 62.) This was because at the time LeMaster started, Hribar Entities' trailers were 85 or 90 percent pneumatic, but "pneumatic freight was becoming more seasonalized" and there was "less work in the winter." (DPFOF 63.) This decreased focus on pneumatic work was a "strategic shift to move [the Hribar Entities] into different modes of transportation" to increase business year-round (DPFOF 64.) LeMaster was hired, in part, to implement this diversification. (DPFOF 65.) Unfortunately for Slegers, he was the last person at the Hribar Entities with pneumatic experience, and he was the salesperson for "all the pneumatic[]" freight. (DPFOF 66.)[9] The strategic shift meant that Slegers

---

[6] A freight broker is a "person, other than a motor carrier … , that as a principal or agent sells, offers for sale, negotiates for … transportation by motor carrier for compensation." 49 U.S.C. § 13102. In other words, a freight broker does not operate trucks but rather works directly with customers and tenders customers' freight to motor carriers who operate trucks to deliver the freight.

[7] A dry van is the "industry term for the normal semi you see down the road" with a tractor and enclosed trailer. (DPFOF 68.)

[8] Pneumatic freight is a "specific type of commod[ity]" such as "cement powder and fly ash" or "slag cement" that requires a "specific type" of pneumatic trailer. (DPFOF 69.)

[9] The Hribar Entities did not hire anyone with pneumatic experience following Slegers' departure. (DPFOF 70.) This is strongly suggestive of a lack of focus on pneumatic sales (contributing to a decrease in that specific area of business).

7

would have to "expand his horizons" and sell more dry van, flat bed, and brokerage work. (DPFOF 67.)

The Hribar Entities' new business strategy meant new expectations for Slegers' role at Hribar Logistics. Instead of nourishing his pre-existing relationships with pneumatic freight customers, Slegers was to "[a]ggressively pursue new customer accounts for both assets and brokerage," in part by making 20 cold calls per day. (DPFOF 71.) In turn, Slegers was expected to gain $2.5 million in new business revenue over approximately 8 months, "[a]dd a minimum of 12 new accounts" that year, and ensure that new customer business had margins of 13%. (DPFOF 72.)

### D. Slegers Resigns His Position With Hribar Logistics.

The Hribar Entities' shift away from pneumatic clients was not a smooth transition for Slegers. (DPFOF 73.) Ultimately, Slegers submitted his resignation as "Director of Sales & Business Development for Hribar Logistics, LLC" on July 15, 2019 via letter, with a resignation date of August 15, 2019. (DPFOF 78.)[10] On July 19, 2019, Jones sent an email to Slegers containing a detailed description of departure information including (i) Slegers' departure date and transition plan, (ii) Slegers' PTO hours and accrual of time off, (iii) continuation of health care coverage, (iv) information on Slegers' health savings account, and (v) Slegers' exit interview. (DPFOF 80.) The email did not mention an operative non-compete agreement. (DPFOF 81.)

Jones did complete a "Termination Checklist" for Slegers. (DPFOF 82.) With a checklist of boxes for applicable "Exit Interview/Termination Discussion" items, Jones did not check the boxes for "Employment Agreement, if applicable" and "Non-compete and non-solicitation Agreement/Confidentiality Agreement." (DPFOF 83.) For the employment agreement section, "N/A" was written, and for the non-compete, Jones noted "(did not sign)":

---

[10] This resignation letter was attached to an email sent from Slegers at MSlegers@HribarLogistics.com with a signature line containing the Hribar Logistics name and logo. (DPFOF 79.)

**Exit Interview/Termination Discussion:**

_____ Schedule exit interview, if employee gave notice

_____ Exit interview and/or termination discussion completed and documented

_____ Obtain employee access information, and passwords, if applicable, for any external websites the employee
has access to.

_____ Obtain phone password, and test to make sure voicemail can be obtained — *Send incoming calls to Luke*

_____ Review the following information with employee:

☐ Employment Agreement, if applicable   *N/A*

☐ Non-compete and non-solicitation Agreement/Confidentiality Agreement   *(did not sign).*

(DPFOF 84.) This was confirmed at Slegers' exit interview, where Jones noted "there's no employment agreement" and "[t]here's no non-compete signed." (DPFOF 85.) For his part, Steven Hribar defers to Human Resources on whether a non-compete provision was in place for Slegers when he departed. (DPFOF 86.)

Following his departure from Hribar Logistics, Slegers initiated the operation of his company, Logistical Resolutions, Inc. (Logistical Resolutions), a Florida Corporation.[11] (DPFOF 88.) On November 1, 2019, Logistical Resolutions and Partners Bulk Logistics, Inc. (PBL), a Michigan-based freight broker, executed an Independent Agent Agreement whereby Logistical Resolutions and Slegers would act as an agent for the brokerage business of PBL. (DPFOF 90.) In short, Slegers would connect the customers that called PBL to motor carriers who transport freight (because PBL does not transport freight). (DPFOF 91.) Slegers would also take customer orders and dispatch trucks of other motor carriers. (DPFOF 92.) These customers included shippers who had previous relationships with both PBL and the Hribar Entities. (DPFOF 93.)

### E.   Hribar Transport Sues Slegers.

On July 8, 2020, Hribar Transport filed this lawsuit alleging that Slegers violated the terms of the non-compete provision in the 2014 Employment Agreement with Hribar Transport.

---

[11] Slegers formed Logistical Resolutions on June 25, 2018 as his employment term with Hribar Transport was approaching expiration. (DPFOF 94.) However, the company was inactive until after his departure from Hribar Logistics. (DPFOF 95.)

(ECF No. 1-1.) Plaintiff asserts that it "has suffered damages from Mr. Slegers' breaches of the Employment Agreement" with Hribar Transport." (ECF No. 12, ¶ 31; *see also id.*, ¶¶ 1 & 7.) Hribar Transport also claims that Slegers breached the non-compete provision of the 2014 Employment Agreement. (ECF No. 12, ¶ 30.) Plaintiff has clarified that it believes Slegers' purported breach caused it to lose business from 11 customers: Rock Solid Stabilization & Reclamation, Inc. (Rock Solid), St. Mary's Cement, Inc. (St. Mary's), Asphalt Materials, Inc./Heritage (Asphalt Materials), Carmeuse/Mintek (Carmeuse), Omni Materials (Omni), Boral Resources (Boral), Mt. Carmel, Ozinga IL (Ozinga), Gleason Ready Mix (Gleason), Prairie, and Buzzi. (DPFOF 96.) Of these disputed customers, four sat for depositions in this case detailing reasons for decreased business with the Hribar Entities including: (i) customer service issues, (ii) lack of capacity, (iii) decreases in freight available generally, (iv) Hribar's physical location, and (v) Hribar's own business strategies. (DPFOF 104.) A fifth customer from this list identified, via affidavit, similar causal disconnect between loss of business by Hribar and the allegations in this case. (DPFOF 105.)

## ARGUMENT

### I.    SUMMARY JUDGMENT IS REQUIRED.

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Here, Slegers bears the initial burden of informing the Court of the basis of his motion and identifying portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that he believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once Slegers meets his burden, the burden shifts to Plaintiff to establish that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). On multiple fronts, Plaintiff cannot meet its burden.

## II. SLEGERS WAS NOT SUBJECT TO A NON-COMPETE WITH HRIBAR TRANSPORT AT HIS DEPARTURE.

Plaintiff seeks to recover damages in connection with a restrictive covenant restraining the post-employment trade of Slegers. This effort is in vain because Slegers was not subject to a non-compete at the time of his departure from Hribar Logistics.

The relevant facts here are undisputed. Slegers was an employee of Hribar Transport over the course of his first three employment agreements with Hribar Transport. (DPFOF 5, 10, 15.) However, as his employment with Hribar Transport was set to expire on January 1, 2019 (DPFOF 15, 19.), Slegers was told that "Hribar had no interest in renewing the contract," and he would become "a regular employee [] like everybody else." (DPFOF 25.) Then, five days before his employment term ended, he was sent a letter from Hribar Logistics dictating his pay structure and benefits package at Hribar Logistics. (DPFOF 27.) Slegers was given a new role and an increased salary. (DPFOF 28.) This new employment situation with Hribar Logistics replaced the terms of his previous employment with Hribar Transport, including the non-compete provision within the 2014 Employment Agreement. Hribar Logistics' letter did not contain a non-compete provision and, despite efforts to implement one by Hribar, Slegers never signed another non-compete. (DPFOF 30, 46, 49.)

The facts of this case echo those of *Hart v. Schering-Plough Corp.*, 253 F.3d 272 (7th Cir. 2001). In *Hart*, an Australia-based employee of Pitman-Moore, Inc. executed a Foreign Assignment Agreement that contained a termination clause providing, "[s]hould your employment be involuntarily terminated by Pitman-Moore, Inc., other than for cause [], the Company will provide you with a severance payment of one (1) year's salary." *Id.* at 275. The employer exercised an option to extend the Foreign Assignment Agreement. *Id.* But, at the end of the Agreement's term, Hart, like Slegers, agreed to stay on with a substantially increased base salary but differing benefits and allowances. *Id.* Two years later, Hart was terminated and brought suit for severance

pay under the Foreign Assignment Agreement. *Id.* The Seventh Circuit Court of Appeals affirmed the trial court's ruling in favor of the employer noting that the parties' contractual relationship (and severance pay agreement) had been replaced. "When the Agreement ran out, [the parties] forged a new arrangement" and "[w]ork after the end of [the Agreement] was governed by new terms." *Id.* The severance pay provision was not part of these new terms. *Id.* A similar result is compelled here, particularly with the introduction of a completely separate entity as Slegers' employer (Hribar Logistics).

The parties' actions reinforce the absence of an active non-compete provision. Hribar Transport's pattern and practice was to replace employment agreements rather than extend them. (DPFOF 5, 10, 15.) Here, the Hribar Logistics letter contains nothing indicating a "mutual written agreement of the parties" for an extension, particularly because a completely separate business entity (Hribar Logistics) was involved. (DPFOF 19, 30.) The letter, not unlike the other consecutive employment agreements, was a replacement – Slegers' employment relationship with Hribar Transport was replaced with a simplified employment relationship with Hribar Logistics. (DPFOF 27, 30.)

Once Slegers became an employee of Hribar Logistics, the parties certainly behaved as if there was no non-compete agreement in place. (DPFOF 29, 45.) In early 2019, Hribar Logistics provided Slegers with a draft standalone non-compete agreement. (DPFOF 45.) LeMaster attempted to get Slegers to sign this standalone non-compete "a couple of times," but Slegers counteroffered and ultimately refused. (DPFOF 46, 47.) A new non-compete provision was never agreed to by the parties. (DPFOF 48.) Hribar Entities' witnesses readily acknowledge that the operative non-compete from the 2014 Employment Agreement had "expired." (DPFOF 50.)

The parties' admitted understandings reveal that Slegers was not subject to an active non-compete at his departure. (DPFOF 50, 83, 84.) Slegers was under the impression that the

December 27, 2018 letter from Hribar Logistics replaced his previous 2014 Employment Agreement and corresponding non-compete provision with Hribar Transport. (DPFOF 87.) Steven Hribar defers to Human Resources on whether a non-compete provision was in place for Slegers when he departed. (DPFOF 86.) Hribar Entities' Human Resources lead confirmed at Slegers' exit interview that "there's no employment agreement" and "[t]here's no non-compete signed." (DPFOF 85.)

Further, the Hribar Entities' actions at the time of departure reveal Slegers was not subject to a non-compete. His resignation notice spurred the off-boarding process by the Hribar Entities. (DPFOF 78.) The Human Resources' informational departure email of July 19, 2019 conspicuously lacks information about a non-compete. (DPFOF 81.) The "Termination Checklist" for Slegers does not mark the "Non-compete and non-solicitation Agreement/Confidentiality Agreement" box but states "(did not sign)." (DPFOF 82, 83, 84.) At bottom, "the parties behaved in accordance with this straightforward" understanding that Slegers was not subject to an active non-compete provision following the December 2018 change in his employment. *See Hart*, 253 F.3d at 275; (DPFOF 45, 85, 87.). Now, Hribar Transport inconsistently seeks to enforce one.

Here, as in *Hart*, Slegers' "work after the end of [the 2014 Employment Agreement] was governed by new terms." *Id.* at 275. (DPFOF 27.) "When the [2014 Employment Agreement] ran out, [Hribar Logistics and Slegers] forged a new arrangement: the fringe benefits specified by the Agreement vanished, the base salary rose," and Slegers' non-compete was relinquished. *Id.* Slegers was no longer subject to a restrictive covenant when he departed Hribar Logistics.[12] (DPFOF 30.)

---

[12] Plaintiff has taken an entirely unsupported position that the December 28, 2018 letter extended Slegers' employment term with Hribar Transport. As a matter of law, it did not. The 2014 Employment Agreement permits extension on "mutual written agreement of the parties." (DPFOF 19.) Nothing in the letter indicates a mutual written agreement for extension, particularly since it is sent by a completely separate business entity. (DPFOF 30.) Further, Slegers' understanding that "Hribar had no interest in renewing the contract" and he would become "a regular employee" dispels Plaintiff's theory. (DPFOF 25.) Slegers did not assent to a mutual extension. (DPFOF 49.)

## III.    EVEN IF THE NON-COMPETE PROVISION WAS ACTIVE, IT IS UNENFORCEABLE.

The non-compete provision is unenforceable because all three restrictions are unreasonable under Indiana law. It has long been held that "noncompetition covenants in employment contracts are in restraint of trade and disfavored by the law." *Central Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728-29 (Ind. 2008). Similarly, "Indiana law strongly discourages employers' attempts to draft unreasonably broad and oppressive covenants." *Product Action Int'l, Inc. v. Mero*, 277 F.Supp.2d 919, 924 (S.D. Ind. 2003)

"To be enforceable, a noncompetition agreement must be reasonable." *Krueger*, 882 N.E.2d at 729. To prove reasonableness, "the employer must first show that it has a legitimate interest to be protected by the agreement." *Id.* Additionally, it "bears the burden of establishing that the agreement is reasonable in scope as to the time, activity, and geographic area restricted." *Id.* This analysis is a question of law. *Id.*

### A.    The First Restriction in the Non-Compete Provision is Unreasonable Because Its Activity Restriction is Unlimited.

The non-compete provision's first restriction is unreasonable because it does not limit the scope of prohibited activity – it prohibits Slegers from working in ***any capacity*** for any business that provides trucking services in eleven states.[13] (DPFOF 20.) The provision holds that Slegers cannot "[a]cquire an ownership interest in, work for, render advice or assistance to or otherwise engage in or enter into any aspect of the business of any ... business [] which provides trucking

---

[13] The Court need not analyze whether a geographical restriction is reasonable where, as here, the non-compete is not limited in its scope. *See MacGill v. Reid*, 850 N.E.2d 926, 932-33 (Ind. Ct. App. 2006) ("Because we find the scope of the activity restricted to be overbroad, thus making the covenant not to compete unenforceable, we will not address the geographic restriction."). Even so, this restriction is unreasonable in its geographic scope as it prevents Slegers from engaging in any trucking business in eleven states. *See Clark's Sales and Service, Inc. v. Smith*, 4 N.E.3d 772, 783 (Ind. Ct. App. 2014) (holding that the geographic restriction that included any state in which the employer did business was unreasonable). Notably, Hribar Transport is unable to explain its legitimate interest in protecting against Slegers working for any trucking company in eleven states nor can it provide a list of the restricted competitors in these states. (DPFOF 20, 96, 97.) If Hribar Transport cannot name restricted competitors, Slegers certainly could not have done so.

services in the states of Indiana, Illinois, Wisconsin, Michigan, Ohio, Tennessee, Pennsylvania, New York, West Virginia, Kentucky and Missouri." (DPFOF 20.) It is clear on the face of this provision that the restriction on Slegers' ability to engage in any activity for another trucking service in eleven states is unreasonably broad. As Hribar Transport's only legally protectable interest is its "good will" – *i.e.*, Slegers' personal contact and business familiarity with Hribar Transport's customers and the prospect of repeat business with those customers – it is unreasonable for Slegers to be prevented from working in the trucking industry in any capacity.

Indiana courts interpreting similar provisions have agreed. In *Gleeson v. Preferred Sourcing*, 883 N.E.2d 164, 175 (Ind. Ct. App. 2008), the court determined a provision to be unreasonable which provided that the employee shall not "directly or indirectly own, manage, operate, control, invest in, lend to, acquire an interest in, or otherwise engage or participate in ... any business (including the sale of any product or service) which directly or indirectly competes with any Business of the Company[.]" Such "noncompetition agreements" that prohibit "an employee from working in any capacity for a competitor or from working within portions of the business with which the employee was never associated are unreasonable because they extend beyond the scope of the employer's legitimate interests." *Id.*

Similarly in *MacGill v. Reid*, 850 N.E.2d 926 (Ind. Ct. App. 2006), the court found unreasonable a non-compete provision providing that the employee "will not own, manage, or materially participate in any business substantially similar to [the employer's] business within a 25 mile radius of [the] principal business address." *Id.* at 928. The provision was unreasonable for, like here, effectively prohibiting the employee from "being employed in any capacity by any other [substantially similar] business and [] because it extends beyond the scope of [the employer's] good will interest of protecting its current customers." *Id.* at 932.

These cases, along with many other Indiana decisions, hold that non-compete provisions restricting an employee from working in any capacity for an employer's competitor are unreasonable and go beyond the scope of an employer's legitimate interest.[14] This is what the non-compete provision here purports to do.

**B.   The Second Restriction Is Unreasonable Because It Is Ambiguous and Its Scope of Restricted Customers Is Excessive.**

The second restriction in the non-compete provision is likewise unreasonable. This restriction demands that Slegers may not "[c]ontact, solicit or entice, or attempt to contact, solicit or entice, any "Customer" of the Business so as to cause, or attempt to cause, any of said Customers not to do business with the Buyer or to purchase services sold by the Buyer from any source other than the Buyer." (DPFOF 20.) The clause defines "Customer" as "those persons or entities to whom Employee or the Company provided services during the term of the Employment Agreement" without regard to whether Slegers ever had contact with the restricted customers. (DPFOF 21.) Left undefined are the terms "Business" and "Buyer." (DPFOF 23.)

This scope of restricted customers is overly broad and unreasonable under Indiana law. In *Clark's Sales and Service*, *supra*, the Indiana Court of Appeals held a provision to be unreasonable that required that the employee shall not solicit "anyone who was a customer of [the employer]'s during the term of [the employee]'s employment." 4 N.E.3d at 781. The court noted that, "although [the employee] was an inside appliance salesman for Clark's, he would be prohibited from performing maintenance, repair, delivery, ordering, or pricing services, to name just a few, to

---

[14] *See, e.g.*, *Sharvelle v. Magnante*, 836 N.E.2d 432, 437-38 (Ind. Ct. App. 2005) (holding that a covenant's prohibition on a physician from practicing "health care of every nature and kind" was unreasonable where the physician had been employed to practice in the specialty of ophthalmology); *Pathfinder Communications Corp. v. Macy*, 795 N.E.2d 1103, 1114 (Ind. Ct. App. 2003) (holding that a covenant's provision that a radio disc jockey would "not engage in activities" at certain radio stations was overbroad because it would have prevented the employee from being employed in any capacity by any radio station listed in the covenant and "extend[ed] far beyond" the employer's legitimate interest in the employee); *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803 (Ind. Ct. App. 2000); *Frederick v. Prof'l Bldg. Maint. Indus., Inc.*, 344 N.E.2d 299, 302 (Ind. Ct. App. 1976).

anyone who was a customer of Clark's during his fourteen-year employment, because those services are competitive to services offered by Clark's." *Id.* at 782. This restriction was patently unreasonable. Similarly, in *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 213 (Ind. Ct. App. 1982), the court found a non-solicitation provision restricting "past or prospective client[s]" to be unreasonable. The restriction here suffers from the same flaws. As such it "is overly broad, onerous, and an undue restriction on [Slegers'] economic freedom." *Clark's Sales and Service*, 4 N.E.3d at 782.

Equally unreasonable is the ambiguity presented by the provision's use of "Business" and "Buyer," two terms that are undefined.[15] (DPFOF 23.) There is no buyer as part of the 2014 Employment Agreement (the only transaction had taken place three years prior) and, in any event, Hribar Transport was never a buyer of Slegers' previous companies (Amston was the purchaser).[16] (DPFOF 4, 15.) This ambiguity dooms the provision. At worst, the provision is potentially unlimited in scope; at best, the provision is entirely unclear. Either way, Slegers could "easily violate the terms of the contract without knowing he was doing so" – an implication of an unreasonable restriction. *Seach*, 439 N.E.2d at 214.

C. **The Third Restriction Is Unreasonable Because It Is Overly Broad In Its Restricted Scope of Activity.**

The third restriction Plaintiff asserts Slegers violated is the restriction prohibiting Slegers from providing "any trucking, hauling or transportation services for a Customer." (DPFOF 20.) Like the others, this restriction is unreasonable and unenforceable.

---

[15] This is a patent ambiguity which is apparent from the face of the document. As such, extrinsic evidence of intent is not permitted, and the Court should interpret the ambiguity as a matter of law against the drafter. *See Oxford Financial Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1143 (Ind. Ct. App. 2003).

[16] If Amston is the "Buyer," Slegers did not solicit Customers "not to do business with the Buyer or to purchase services sold by the Buyer from any source other than the Buyer" since Amston does not sell brokerage services and PBL is a freight broker only. (DPFOF 4, 90.)

First, covenants not to compete – like this – that prevent any employee from working in any capacity in the business of the former employer are unreasonably broad. *See MacGill*, 850 N.E.2d at 930; *Gleeson*, 883 N.E.2d at 175. Second, once again, the restriction precludes activity with Hribar Transport customers, regardless of whether Slegers had any dealings with such customers during his employment. This is unreasonable. *See Clark's Sales and Service*, 4 N.E.3d at 782; *Seach*, 439 N.E.2d at 214. Third, the provision does not define "transportation services," which creates a problematic ambiguity. (DPFOF 20.) One reading of the term would extend the restriction to prohibit Slegers from using his expertise (transportation) in any fashion and preclude him from working with anyone to whom Hribar Transport provided any service over an eight-year period. This is manifestly unreasonable. Equally problematic is that Logistical Resolutions and Slegers do not provide "trucking" or "hauling." (DPFOF 89.) To the extent Plaintiff seeks to enforce this particular provision, it must be asserting that Slegers violated it by acting as an agent for PBL's brokerage work. (DPFOF 90.) Put differently, Plaintiff reads the provision to mean that an agent of a freight broker provides "transportation services" within the meaning of the non-compete provision. But, Hribar Transport is not and cannot be a freight broker.[17] It has no legitimate interest in precluding Slegers' provision of brokerage services. The ambiguity leaves no room for doubt – the provision is unreasonable.

### D. Hribar Transport Cannot Ask the Court to Rewrite Its Unreasonable Non-Compete Provision.

Plaintiff cannot turn to the Court to resuscitate its unreasonable non-compete provision. Under Indiana law, if a non-compete "is divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only." *Clark's Sales and*

---

[17] Hribar Transport does not possess broker authority via the Federal Motor Carrier Safety Administration. (DPFOF 37.) Absent proper broker authority by the FMCSA, Hribar Transport cannot act as a broker, *i.e.*, sell, offer, or negotiate for transportation of freight by a motor carrier. (DPFOF 37.) *See* 49 U.S.C. §§ 13102(2), 13902(a)(6).

*Service*, 4 N.E.3d at 783. However, the Court may not use blue penciling to create a new agreement – "it may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement that they have not made." *Id.* Further, "[w]hen blue-penciling, a court must not add terms that were not originally part of the agreement but may only strike unreasonable restraints or offensive clauses to give effect to the parties' intentions." *Id.* at 783-84; *see also Gleeson*, 883 N.E.2d at 177.

None of the restrictions may be rewritten because each were drafted as indiscrete whole provisions. *See Licocci v. Cardinal Associates, Inc.*, 445 N.E.2d 556, 561 (Ind. 1983) ("if the covenant is clearly separated into parts and some parts are reasonable and others are not, the contract may be held divisible" and the restrictions then may be enforced); *Clark's Sales and Service*, 4 N.E.3d at 784 ("There is no clear separation of terms or clauses that were or could be intended to be excised from the whole without changing the entire meaning and import of the passage.").

Moreover, the Court cannot effectively rewrite the provisions to make them reasonable. No revision could remedy the overbreadth of the scope of activities prohibited in the first restriction. *See Gleeson*, 883 N.E.2d at 177 (concluding that the court "cannot make the provision reasonable without adding terms to limit its application"); *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803, 811 (Ind. Ct. App. 2000). The same goes for the excessive scope of restricted activities and the ambiguous restriction against "transportation services." Lastly, the Court cannot resolve the ambiguities presented by the undefined and inapplicable terms of "Buyer" and "Business" without creating a new agreement which was never part of the parties' intent. *MacGill*, 850 N.E.2d at 930 ("A covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited."); *see also Unisource Worldwide, Inc. v. Carrara*,

244 F.Supp.2d 977, 982 (C.D. Ill. 2003) ("To say the least, the contract is ambiguous and unintelligible. Since there is no definite agreement on the essential terms of the restrictive covenant, it is unenforceable.") (internal citations omitted); *Licocci*, 445 N.E.2d at 561. (DPFOF 23.)

At bottom, this Court should not give Hribar Transport a free pass on its overly-restrictive drafting, particularly because the provision is plagued with unenforceability problems (as opposed to a one-off need for editing). Here, Hribar Transport had three opportunities to draft reasonable restrictive covenants in its employment agreements with Slegers. (DPFOF 5, 10, 15.) It is not the Court's imperative to give it a fourth bite at the apple. *Product Action Int'l*, 277 F.Supp.2d at 932 ("[T]he courts need not do for the employer what it should have done in the first place – write a reasonable covenant."); *Clark's Sales and Service,* 4 N.E.3d at 786 (refusing to apply the blue pencil doctrine where employer "had a fair opportunity to draft a reasonable and enforceable restrictive covenant yet failed to do so.").

## IV.    SLEGERS DID NOT BREACH ANY NON-COMPETE PROVISION.

### A.    Slegers Did Not Violate the Non-Compete Provision's Restriction on Working for Competitors.

Plaintiff seeks damages based upon Slegers working as an agent "for Partners Bulk Logistics, a competitor of Hribar [Transport]." (ECF No. 12, ¶ 30.) However, Plaintiff misinterprets its own contract to reach this conclusion. The Court should not follow suit.

The pertinent restriction holds that Slegers cannot work for a "Competitor," defined as any "business [] which provides trucking services" in eleven states. (DPFOF 22.) PBL does not provide trucking services but is a freight broker with property broker authority granted by the Federal Motor Carrier Safety Administration. (DPFOF 90.) It does not possess motor carrier authority and, therefore, cannot transport freight or provide trucking services. (*Id*.) It has no power units (trucks).

(*Id.*) Hribar Transport, on the other hand, is a motor carrier with no broker authority – it can transport freight but cannot broker it. (DPFOF 37.)

Hribar Transport and PBL are not competitors under the terms of the non-compete agreement Hribar Transport drafted. Slegers is entitled to summary judgment on the claim that he violated the non-compete by working with PBL.[18]

### B.     Slegers Did Not Solicit Customers in Violation of the Non-Compete.

Plaintiff's assertion that Slegers solicited customers in violation of the non-compete provision also falls short. (*See* ECF No. 12, ¶ 30.) Even if Plaintiff could show that the non-compete was active and enforceable, the undisputed facts establish that Slegers did not solicit any customers of Hribar Transport. (DPFOF 108-113.)

Where, as here, the restriction contains no definition of "solicit" or "induce," Indiana courts look to dictionaries for assistance. *Enhanced Network Sols. Grp., Inc. v. Hypersonic Techs. Corp.*, 951 N.E.2d 265, 268 (Ind. Ct. App. 2011). Black's Law Dictionary defines solicitation as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition;" inducement is "[t]he act or process of enticing or persuading another person to take a certain course of action." *See* Black's Law Dictionary (11th ed. 2019). Inherent in these definitions is the active request for action. Put differently, a violation of a non-solicitation provision cannot result merely from the acceptance of business. *See Enhanced Network Sols. Grp.*, 951 N.E.2d at 268-69 (contact initiated by a former client of the previous employer and the former employees' response to what was led by the former client was not in breach of the non-solicitation clause in the agreement.)

---

[18] A similar conclusion applies to the assertion that Slegers violated the non-compete by "acquiring an ownership interest in Logistics Solutions, Inc. [sic], a competitor of Hribar [Transport]" and "performing trucking, hauling or transportation services for customers of Hribar [Transport]." Logistical Resolutions is an agent for a freight broker (DPFOF 90.) It does not and cannot provide "trucking services" and therefore is not a "Competitor" of Hribar Transport under the terms of the non-compete. (DPFOF 22, 89.) Likewise, as discussed in Section III.C., to the extent the undefined term of "transportation services" includes agent work for a freight broker (which Hribar Transport is not), the scope of the non-compete provision is unreasonable. (DPFOF 20, 37.)

The only testimony in the record establishes that Slegers did not solicit customers of Hribar Transport. For example, Anthony Isner of Asphalt Materials testified that following Slegers' departure from Hribar, Slegers "never solicited [him] for freight." (DPFOF 108.) Likewise, Slegers declined to discuss business opportunities with Doug Anderson of Boral in late 2019 – instead, Boral reached out to PBL directly. (DPFOF 109.) Slegers has not tried to direct any Carmeuse business to PBL. (DPFOF 110.) Phil Dahm of Rock Solid called Slegers after Rock Solid was no longer working with the Hribar entities. (DPFOF 111.) And, the amount of business that Prairie gives Hribar has nothing to do with Slegers. (DPFOF 112.) Further, the undisputed facts confirm that Slegers did not "cause, or attempt to cause, any of said Customers not to do business" with Hribar Transport. (DPFOF 113.)

## V.  HRIBAR TRANSPORT CANNOT DEMONSTRATE DAMAGES.

"Under Indiana law, a plaintiff carries the burden to plead and prove damages." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006). Plaintiff cannot meet this burden. Hribar Transport's data confirms that it ***increased revenue*** over the time it claims Slegers caused it damages. (DPFOF 98.) Expert analysis cannot solve this problem because Hribar Transport – the sole Plaintiff in this case – and its expert cannot isolate damages it alone incurred. (DPFOF 101.) Plaintiff's expert concedes that the Hribar Entities' accounting does not permit opining on damages incurred by Hribar Transport. (*Id.*) Further, a customer-by-customer analysis does nothing to bolster Plaintiff's damage claim. And, most customers increased business with the Hribar Entities following Slegers' departure. (DPFOF 107.) The others, as addressed in Section VI, decreased business based on reasons wholly unrelated to Slegers.

### A.  Hribar Transport Increased Revenue Following Slegers' Departure.

Importantly, "[a] mere showing of a breach of contract does not necessarily entitle a plaintiff to damages." *Lincoln Nat'l Life Ins. Co. v. NCR Corp.*, 772 F.2d 315, 320 (7th Cir. 1985).

"Instead, a plaintiff is limited to recovering only the losses actually suffered from the breach, and an injured party may not be placed in a better position than he would have enjoyed if the breach had not occurred." *Shepard*, 463 F.3d at 745. The data shows that Hribar Transport is in a better position after Slegers' departure. (DPFOF 98.)[19]

In fact, Hribar Transport increased profits over the time it claims Slegers caused injury. (*Id*.) Since Slegers' departure, the Hribar Entities as a collective have increased revenue.[20] Hribar Transport's tax filings demonstrate this fact – its gross revenue from sales and receipts increased from $2,551,338 in 2018 to $3,133,552 in 2019 and topped off at $3,400,176 in 2020. (*Id*.) This increase in profits is not in dispute. (*Id*.) Steven Hribar admits that revenues increased after Slegers' departure. (*Id*.) And this growth has been across industry segments. (*Id*.)

As Steven Hribar declared, the numbers "speak for themselves." (*Id*.) What the numbers say is that "it does not appear that [Hribar Transport] has suffered *any* actual or consequential damages here—aside from the indignity of having his confidences betrayed." *Shepard*, 463 F.3d at 748 (emphasis in original). The Court need not go any further to conclude that Plaintiff's claim of damages lacks merit. *See Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct. App. 1998).

### B.    Hribar Transport Cannot Isolate Damages It Purportedly Incurred.[21]

A deeper financial analysis does not save Plaintiff's damages claim. Only the Plaintiff may recover for damages on a breach of contract claim but, here, the sole Plaintiff – Hribar Transport – cannot demonstrate that it incurred any damages.

---

[19] Hribar Logistics also increased revenue following Slegers' departure. (DPFOF 99.)

[20] During this time, Hribar Transport has increased operational capabilities, ramping up from 19 trucks and drivers on December 27, 2019 to 61 trucks and drivers on June 24, 2022. (DPFOF 100.)

[21] While Defendant vigorously disputes Plaintiff's right to a belated and unsupported amendment to add parties, such an amendment, if allowed, would arguably only impact this section of Defendant's arguments in support of summary judgment. (*See* ECF No. 34.)

At his deposition, Plaintiff's damage expert, Steven VanderBloemen, admitted that the financial data in this case precludes him from isolating damages incurred by just Hribar Transport. (DPFOF 101.)[22] Instead, VanderBloemen issued a "report [that] includes all the [Hribar] companies" and not just Hribar Transport. (DPFOF 102.) Ultimately, Plaintiff's expert cannot opine on damages incurred by Hribar Transport alone. (DPFOF 101.)[23] Hribar Transport cannot bootstrap its claims to that of non-parties to the non-compete provision. This speculative and incorrect assessment of damages does not pass muster. *Johnson v. Shanehsaz*, 152 N.E.3d 7, 19 (Ind. Ct. App. 2020) (rejecting lost profits calculations when speculative and unsupported by documentation); *see also Clark's Pork Farms v. Sand Livestock Sys.*, 563 N.E.2d 1292, 1298 (Ind. Ct. App. 1990).

### C. Customers Increased Business with the Hribar Entities after Slegers Left.

A customer-by-customer analysis cannot demonstrate damages. For four of the eleven customers in dispute, revenue by Hribar Entities undisputedly increased following Slegers' departure:

| CUSTOMER | 2019 | 2020 | 2021 |
|---|---|---|---|
| Asphalt Materials | $1,002,822.07 | $824,682.96 | $972,670.40 |
| Boral | $671,418.68 | $0.00 | $0.00 |
| Buzzi | $90,835.30 | $135,404.97 | $182,282.11 |
| Carmeuse | $10,920.27 | $26,209.86 | $85,871.21 |
| Gleason | $358.59 | $980.09 | $0.00 |

---

[22] The Hribar Entities' accounting also precludes any reliable customer-by-customer damage analysis. For example, financial data purportedly for Rock Solid includes designations for "Rock Solid Logistics," "Rock Solid Stabilization," and "Bedrock Stabilization Co.," so it remains unclear what data actually applies to the customer at dispute in this case. The same goes for St. Mary's (providing varying data for "St. Mary's – Flyash" and "St. Mary's – Prairie Materials"), Carmeuse (including data for "Carmeuse Lime Inc.," "Mintek Resources," and "Carmwest"), Omni Materials (providing data as "Omni Material – Mt. Carmel Stabilization"), Boral (referring to customers, "Headwaters," "Headwater Flo-Fill/Headship," and "ISGEBPIN"), Mt. Carmel (referring to "Omni Material – Mr. Carmel Stabilization"), Prairie (designating "St. Mary's – Prairie Materials"), and Buzzi (including designations for "Buzzi," "Buzzi – Non EDI Loads," "Buzzie Industries," "BUZZI Unicem USA/Heartland Cement," "Buzznoedi – Buzzi Industries," "Buzbeth – Buzzi," "Buzzind – Buzzi – non EDI loads," and "Lonestar – Buzzi Unicem USA/Heartland Cement.") (DPFOF 106.)

[23] Steven Hribar defers to VanderBloemen's opinion on damages without any apparent understanding of the financial status of his own entity or entities. (DPFOF 103.)

| CUSTOMER | 2019 | 2020 | 2021 |
|---|---|---|---|
| Mt Carmel | $723.12 | $0.00 | $8,810.97 |
| Omni | $502,811.83 | $30,957.32 | $121,095.51 |
| Ozinga | $0.00 | $0.00 | $0.00 |
| Prairie | $41,876.44 | $14,748.45 | $8,184.69 |
| Rock Solid | $171,514.61 | $0.00 | $3,716.28 |
| St. Mary's Cement | $286,615.06 | $523,684.26 | $436,882.71 |

(DPFOF 107.) Specifically, Plaintiff's own records reveal that the Hribar Entities undisputedly increased profits with Buzzi, Carmeuse, Mt. Carmel, and St. Mary's. (*Id.*) Plaintiff's expert's calculations similarly reflect increased revenue with St. Mary's, Prairie, and Buzzi. (DPFOF 142.) And, revenue remained at $0 for Ozinga and remained consistent with Asphalt Materials. (DPFOF 107; DPFOF 142)[24] Where profits are increased, not lost, summary judgment on Plaintiff's claims regarding these customers is still required. *See infra*. Moreover, there is simply no meaningful trend or trajectory within these figures to suggest a causal connection.

## VI. HRIBAR TRANSPORT CANNOT PROVE CAUSATION FOR ANY LOSS OF BUSINESS FOR CUSTOMERS WITH WHOM IT DID NOT INCREASE BUSINESS.

Even if the Plaintiff can demonstrate an active, enforceable non-compete provision, breach of the provision, and damages (which it cannot), the undisputed facts reveal that Plaintiff cannot demonstrate that Slegers' purported breach caused damages. Under Indiana law, a party seeking damages as a result of a breach of a non-compete provision must demonstrate "but for" causation. The Plaintiff must prove that "but for" Slegers' breach of the non-compete covenant, Hribar Transport would have received the business revenues it claims it lost. *Turbines, Inc. v. Thompson*, 684 N.E.2d 254, 258 (Ind. Ct. App. 1997). Here, the Plaintiff "skipped this first step and provided no explanation of how to distinguish lost profits that resulted from Defendants' alleged wrongdoing [] from lost profits that resulted from" other business reasons. *Zimmer, Inc. v. Stryker*

[24] Nor could Plaintiff show causation for Ozinga. The Hribar Entities strategically moved on from Ozinga after believing that rates were too low and better opportunities were elsewhere. (DPFOF 112.)

*Corp.*, 2018 WL 276324, at *3 (N.D. Ind. Jan. 3, 2018). Even worse, the undisputed facts actually demonstrate that customer losses were not at all a result of Slegers' actions.

As demonstrated in Section V.C., the Hribar Entities' revenue with only five[25] of the eleven disputed customers decreased following Slegers' departure. (DPFOF 107.) For each of these customers – Asphalt Materials, Boral, Gleason, Omni, Prairie, and Rock Solid – the undisputed testimony reveals that Slegers did not cause a decrease in business.[26] Rather, it was the Hribar Entities' own customer service issues, lack of capacity, and business decisions that spurred decreased revenue. These reasons for decreased business with the Hribar Entities permeate through all customer (and independent witness) testimony in this case, and these consistent explanations from non-party customers have not been met with any contrary customer testimony nor refutation by Hribar itself.

Anthony Isner of Asphalt Materials testified that he did not take loads away from Hribar, but instead only gave *new* loads to PBL when Hribar did not have the capacity to handle them. (DPFOF 115.) These loads were pneumatic in nature. (DPFOF 116.) In some instances, Hribar told Isner that it could not handle Asphalt Materials loads. (DPFOF 117.) Other times, Hribar would fail to deliver freight in the week it was supposed to be delivered. (DPFOF 118.) Even then, Isner continued to use Hribar for work without interruption until the particular project was no longer available for any motor carrier (not just Hribar Transport). (DPFOF 119.)

Likewise, Slegers did not steer Boral business away from the Hribar Entities. Boral's contract with Hribar expired in 2017 and was not renewed due to reliability issues with the Hribar

---

[25] Business with Asphalt Materials remained constant. (DPFOF 107; DPFOF 142.) Nonetheless, this section addresses the inability of Plaintiff to demonstrate causation related to Asphalt Materials.

[26] No testimony or documentary evidence in the record establishes causation for any of the disputed customers. Notably, Plaintiff's expert does not take into account customer-by-customer explanations for decreases in business. (DPFOF 102.) This undercuts Plaintiff's causation and damages position. *See Zimmer*, 2018 WL 276324, at *5 (striking expert where "[l]ikely due to his equation of liability with causation of damages, [the expert] failed to consider 'obvious alternative explanations' for [the former employer's] lost revenues").

Entities. (DPFOF 120.) Even then, Boral continued to do business with Hribar. (DPFOF 121.) After Slegers left Hribar Logistics in August 2019, no one from the Hribar Entities reached out to secure Boral business. (DPFOF 122.) Perhaps this is because Boral's business required pneumatic transportation. (DPFOF 123.) Steven Hribar is aware that Boral believes the Hribar Entities have not sought business from Boral. (DPFOF 124.) In any event, the location of the Hribar Entities and significant customer service issues have resulted in Boral not doing business with the Hribar Entities. (DPFOF 125.) Further, Boral work generally has decreased due to the environmental regulations surrounding its product. (DPFOF 126.)

Tina Hull of Omni Materials details similar reasons causing decreased business with Hribar Transport. Namely, since Slegers' departure, Hribar Transport has not solicited business from Omni. (DPFOF 128.) And, while Hribar Transport still services two of Omni's active accounts, Omni's loss of a previous account that Hribar Transport serviced has caused decreased business between the entities. (DPFOF 129.) As with Gleason, Steven Hribar does not know if his team has pursued business from Omni. (DPFOF 130.) Additionally, due to a financial downturn at Gleason, the Hribar Entities did not have an expectation of any business from Gleason during the relevant period. (DPFOF 127.)

Phil Dahm of Rock Solid detailed customer service and punctuality issues with Hribar, including late cancellations and sending fewer trucks than agreed upon. (DPFOF 131.) LeMaster admits that there were instances where the Hribar Entities turned down work from Rock Solid because they did not have driver capacity. (DPFOF 132.) Ultimately, Rock Solid did not work with Hribar in 2020 because of "service concerns" and lack of demand in the area. (DPFOF 133.) Like Boral, Rock Solid's business required pneumatic transportation. (DPFOF 134.)

Capacity and customer service issues have caused Prairie to decrease but not stop providing loads to Hribar. (DPFOF 135.) For Prairie, these reliability issues mean that they are lucky to get

"50 percent of what" is promised for delivery by Hribar. (DPFOF 136.) Despite these issues, Prairie has "tr[ied] to use [Hribar] a lot more [in the past two years], but they're either never available and/or end up backing out." (DPFOF 137.) Simply, "it is hard to predict whether the work will be done" with Hribar. (DPFOF 138.)

Plaintff cannot bridge the evidentiary gap on causation through its own testimony. For example, LeMaster claims he has no idea why Hribar Transport has not obtained more business from Rock Solid, St. Mary's, or Asphalt Materials (even when customers have testified clearly about service failures). (DPFOF 139.) And, Steven Hribar admits that the Hribar Entities' revenue from Prairie decreased to nearly nothing before Slegers departed. (DPFOF 140.) Nothing else in the record can support a claim of "but for" causation. Summary judgment is necessary. *Turbines*, 684 N.E.2d at 258.

<div align="center"><u>**CONCLUSION**</u></div>

Plaintiff's action to restrain the trade and recover from Slegers is fraught with issues that preclude the case from advancing further. First, Plaintiff cannot demonstrate that Slegers was even subject to a non-compete provision with Hribar Transport. Rather, the undisputed facts demonstrate that Slegers' employment agreement – and non-compete provision – with Hribar Transport was superseded and replaced with a non-contractual employment relationship with Hribar Logistics. This conclusion is revealed by the parties' actions at the time.

Further, the non-compete provision Plaintiff seeks to enforce is patently overly broad, ambiguous, and unreasonable. It is unenforceable and cannot be re-drafted. Even so, Slegers did not breach the non-compete provision. After his work with the Hribar Entities, Slegers worked as an agent for a freight broker, an industry Hribar Transport is not in and a service it does not and cannot provide. And, depositions in this case reveal that Slegers did not solicit cross-over customers.

Equally problematic is that Hribar Transport actually became more profitable after Slegers' departure, so it cannot demonstrate damages. Even its expert and a customer-by-customer analysis cannot manufacture damages in this case. Plaintiff's expert cannot isolate damages incurred by Plaintiff from those relating to a host of separate entities who were not parties to the non-compete. And, for some disputed customers, Hribar Transport increased profit after Slegers left. Each of the customers where Hribar Transport saw decreased revenue testified (or declared under the penalty of perjury) that Slegers did not cause any decreased work. Rather, it was Hribar Transport's customer service issues, lack of capacity, and strategic decisions, along with economic downturns the customers individually faced that caused any decreased business. Put differently, Slegers did not cause Plaintiff any damages.

For the foregoing reasons, Defendant respectfully requests that the Court grant his motion for summary judgment in this action.

Dated: August 9, 2022.

s/ Andrew R. Brehm
Steven F. Stanaszak
Andrew R. Brehm
SCOPELITIS GARVIN LIGHT HANSON
& FEARY P.C.
330 East Kilbourn Avenue, Suite 827
Milwaukee, WI 53202
(414) 219-8500
(414) 278-0618 Fax
sstanaszak@scopelitis.com
abrehm@scopelitis.com

Andrew F. Marquis
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
(317) 637-1777
(317) 687-2414 Fax
amarquis@scopelitis.com

Attorneys for Defendant

4868-2092-4708, v. 10