UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

HRIBAR TRANSPORT LLC,

          Plaintiff,

                                       Case No. 20-cv-1255-pp

    v.

MICHAEL SLEGERS,

          Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 40), DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 54) AND DISMISSING CASE**

---

On August 14, 2020, the plaintiff sued the defendant for breach of contract. Dkt. No. 1. The plaintiff alleges that the defendant breached the restrictive covenants in his employment agreement by forming a competing business and soliciting the plaintiff's customers. Dkt. No. 12 at ¶30. On August 9, 2022, the defendant filed a motion for summary judgment. Dkt. No. 40. On September 15, 2022, the plaintiff filed a combined brief in opposition and cross-motion for partial summary judgment. Dkt. No. 54. Because the restrictive covenants in the employment contract are unenforceable, the court will grant the defendant's motion for summary judgment.

I.    **Relevant Facts**

    A.    <u>The Parties</u>

The plaintiff is one of several transportation companies with common ownership. Dkt. Nos. 57 at ¶34; 33 at ¶2; 69 at ¶1; 61 at ¶2. Those companies are the plaintiff; Hribar Logistics, LLC; Hribar Bros., Inc.; Hribar Trucking, Inc.; and Amston Supply, Inc. Dkt. Nos. 69 at ¶1; 61 at ¶2. The plaintiff handles the

1

transportation run through company-employed, non-union drivers, while
Hribar Bros. handles the transportation run through independent owner
operators. Dkt. Nos. 57 at ¶¶35–36; 33 at ¶¶3–4; 69 at ¶2; 61 at ¶3. Hribar
Logistics is the company's freight management arm, responsible for
administering the business from customers and dispatching the work to
company drivers or owner operators, as well as for billing and collections for
both the plaintiff and Hribar Bros. Dkt. Nos. 57 at ¶38; 33 ¶5; 69 at ¶¶2–3; 61
at ¶4. Amston Supply owns the trucks and other hard assets of the Hribar
entities. Dkt. Nos. 69 at ¶4; 61 at ¶6.

The defendant owned and operated a transportation company called
MCS Trucking, Inc. and a truck leasing company called SWI Leasing, Inc. Dkt.
Nos. 57 at ¶¶1; 36 at ¶3; 45-1 at 4, Tr. p. 12. In December 2011, the defendant
sold those transportation and truck leasing businesses to Amston Supply. Dkt.
Nos. 57 at ¶4; 36 at ¶3; 44-1; 45-1 at 6, Tr. p. 18.

B.    The Employment Agreements

On December 9, 2011, the defendant entered into an employment
agreement with the plaintiff. Dkt. Nos. 57 at ¶5; 44-2. The 2011 employment
agreement stated that the defendant would "perform duties as are assigned to
him by the Company, which will include terminal manager, transitioning the
customer base of MCS Trucking, Inc. to the Company and servicing such
customers, and such other duties and responsibilities as may reasonably be
assigned or delegated to employee from time to time." Dkt. Nos. 57 at ¶7; 44-2
at ¶3. The contract provided that the term of the 2011 employment agreement
ended on December 8, 2012, but could be extended if the parties agreed to the
extension in writing. Dkt. Nos. 57 at ¶8; 44-2 at ¶2. The 2011 employment
agreement also contained restrictive covenants, including a covenant not to

2

compete, not to solicit customers and not to perform services for customers. Dkt. Nos. 57 at ¶9; 44-2 at ¶8.

The parties executed a new employment agreement on February 28, 2013. Dkt. Nos. 57 at ¶10; 44-4 at 6. The 2013 employment agreement contained restrictive covenants similar to the ones in the prior agreement. Dkt. Nos. 57 at ¶11; 44-4 at ¶8. The 2013 employment agreement provided that its term ended December 31, 2013, but could be extended if the parties agreed to the extension in writing. Dkt. Nos. 57 at ¶12; 44-4 at ¶2.

The parties opted not to extend the 2013 employment agreement when it expired. Dkt. No. 57 at ¶14. Instead, the parties executed another employment agreement on January 1, 2014. Id. at ¶15; Dkt. No. 44-5. The 2014 agreement stated that "the employment term" was to "continue until January 1, 2019" but that "[t]he term may be extended upon mutual written agreement of the parties." Dkt. Nos. 57 at ¶19; 44-5 at ¶2. The 2014 employment agreement contained the following restrictive covenants:

8.      Agreement Not to Compete

(a)      The Employee acknowledges that the Company's business and customer contacts are established and maintained at great expense and that the Employee would be able to compete unfairly with the Company unless the Employee is subject to the restrictions contained herein. As a result, the Employee agrees to the restrictions set forth below and shall not, during the term of the Employment Agreement and for a period of two (2) years thereafter:

(1)      Acquire an ownership interest in, work for, render advice or assistance to or otherwise engage in or enter into any aspects of the business of any "Competitor" (as defined below); or

(2)      Contact, solicit or entice, or attempt to contact, solicit or entice, any "Customer" of the Business so as to cause, or attempt to cause, any of said Customers not to do business with the Buyer or to purchase services sold by the Buyer from any source other than the Buyer; or

3

(3)     Perform any trucking, hauling or transportation services for a Customer.

\*    \*    \*    \*

For purposes of this Paragraph 7(a), the term "Competitor" shall mean any business, incorporated or otherwise, which provides trucking services in the states of Indiana, Illinois, Wisconsin, Michigan, Ohio, Tennessee, Pennsylvania, New York, West Virginia, Kentucky and Missouri, and the term "Customer" shall mean those persons or entities to whom Employee or the Company provided services during the term of the Employment Agreement.

Dkt. Nos. 57 at ¶¶20–22; 44-5 at ¶8. The contract does not define "Business," "Buyer," "transportation services" or "trucking services." Dkt. Nos. 57 at ¶23; 44-5. The 2014 employment agreement stated that it is governed by Indiana law. Dkt. Nos. 57 at ¶16; 44-5 at ¶15.

In December 2018—five days prior to the end of the term stated in the 2014 employment agreement—the defendant received a letter regarding his salary and benefits. Dkt. Nos. 57 at ¶27; 44-7. The letter was printed on Hribar Logistics letterhead; it does not mention the plaintiff (Hribar Transport LLC) and does not explicitly refer to the 2014 employment agreement. Dkt. No. 44-7. The defendant signed the letter on December 28, 2018. Dkt. Nos. 57 at ¶29; 44-7. The parties dispute whether the December 2018 letter superseded or extended the 2014 employment agreement. Dkt. No. 57 at ¶¶42–44.

C.     The Defendant's Departure

Both Andy Smith (the defendant's former supervisor) and Jeff Schultz (the plaintiff's operations manager) resigned in late 2018, and the defendant began reporting to a new supervisor (Lucas LeMaster). Dkt. Nos. 57 at ¶¶52–54; 45-3 at 7, 12, Tr. pp. 25, 44–46; 45-5 at 6, 10, Tr. pp. 20, 72–73; 44-14; 44-8. The parties dispute whether the plaintiff's business strategy changed around this time to focus less on pneumatic trucking and more on other areas

4

of the transportation business. Dkt. No. 57 at ¶¶55–56, 62–65. The parties agree that the defendant's specialty was in pneumatic freight sales and that around this time, he was told to "expand his horizons" into other areas of the plaintiff's business. Dkt. No. 57 at ¶¶66–67, 71; 45-3 at 7–11, Tr. pp. 23–25, 27, 31–34, 37–38; 44-15.

The defendant submitted his resignation in July 2019, with an effective date of August 15, 2019. Dkt. Nos. 57 at ¶78; 44-18. A few days later, the defendant received an email from human resources with information relating to his departure from the plaintiff. Dkt. Nos. 57 at ¶80; 44-19. The email did not mention that the defendant was subject to an operative noncompete agreement. Dkt. Nos. 57 at ¶81; 44-19. The termination checklist completed by the plaintiff's human resources manager reflected that the defendant did not have an employment agreement or a noncompete, as did the exit interview notes. Dkt. Nos. 57 at ¶84–85; 44-20; 45-10 at 14–15, Tr. pp. 50–54.

After his departure in August 2019, the defendant began operating Logistical Resolutions, Inc., a Florida corporation. Dkt. Nos. 57 at ¶88; 45-1 at 16, Tr. p. 60. In November 2019, Logistical Resolutions and Partners Bulk Logistics, Inc. (PBL) executed an independent agent agreement whereby Logistical Resolutions and the defendant would act as an agent for PBL's brokerage business. Dkt. Nos. 57 at ¶90; 44-21; 44-22; 45-1 at 24, Tr. p. 93. As PBL's agent, the defendant would take customer orders and dispatch trucks of other motor carriers. Dkt. Nos. 57 at ¶92; 45-1 at 27, Tr. pp. 103–04. These customers included customers who had previous business relationships with the plaintiff. Dkt. Nos. 57 at ¶93; 45-1 at 26–27, 29, Tr. pp. 98–101, 103, 111–112; 45-6 at 7, Tr. pp. 24–25; 45-7 at 6, Tr. pp. 18–19; 45-9 at 3, Tr. pp. 8–9.

5

The plaintiff contends that the defendant's work for PBL was a breach of the restrictive covenants in the 2014 employment agreement and that that breach caused it to lose business from ten customers. Dkt. Nos. 57 at ¶96; 69 at ¶37. The parties have many factual disputes over whether the defendant's conduct constitutes a breach, whether the plaintiff did indeed lose business and whether that loss is traceable to any breach by the defendant. Dkt. Nos. 57 at ¶¶104–42; 69 at ¶¶34–37. The court will not detail these factual disputes, because the restrictive covenant agreements in the 2014 employment agreement are unenforceable, rendering immaterial the questions of breach and damages.

## II.    Summary Judgment Standard

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "Material facts" are those that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

"To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Anderson, 477 U.S. at 255). "However, favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). The court also may "not weigh

6

credibility, balance the relative weight of conflicting evidence, choose between competing inferences, or resolve swearing contests." Flowers v. Renfro, 46 F.4th 631, 636 (7th Cir. 2022); Berry v. Chi. Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders.").

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Failure to prove one essential element "necessarily renders all other facts immaterial." Id. at 323.

To prevail on a breach of contract claim under Indiana law,[1] the plaintiff must establish "the existence of a contract, the defendant's breach of the contract, and the plaintiff's damages as a result of the breach." WESCO Distribution, Inc. v. ArcelorMittal Indiana Harbor LLC, 23 N.E.3d 682, 708 (Ind. Ct. App. 2014). But contracts with post-employment restrictions are "disfavored" in Indiana and courts "will not enforce an unreasonable restriction." Cent. Indiana Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 729 (Ind. 2008). "[T]he reasonableness of a noncompetition agreement is a question of law." Id.

---

[1] The 2014 employment agreement states that it is governed by Indiana law. Dkt. No. 44-5 ¶15. In their summary judgment briefing, the parties do not dispute the choice of law and, in its order on the plaintiff's motion to amend the complaint, this court already found that Indiana law applied to the dispute. Dkt. No. 53 at 17.

7

### III.    The Employment Contract

A threshold issue is whether the defendant was subject to *any* restrictive covenants at the time he resigned from employment with the plaintiff. The parties executed multiple employment agreements during the defendant's employment. Dkt. No. 57 at ¶¶5, 10, 15. The parties agree that the 2014 employment agreement (and the December 2018 letter's impact on that agreement) is the only agreement at issue here. Id. at ¶15 (agreeing that the parties "executed a new, replacement employment agreement with an effective date of January 1, 2014"). The prior employment agreements were for a fixed term and expired in 2012 and 2013, prior to the parties' execution of the 2014 employment agreement. Id. at ¶¶8, 12. The 2014 employment agreement contains a clause stating that it constitutes "the entire agreement" between the parties "concerning the subject matter hereof and supersedes all prior agreements." Dkt. No. 44-5 at ¶11. A clear and unambiguous integration clause controls under Indiana law. Ryan v. TCI Architects/Engineers/ Contractors, Inc., 72 N.E.3d 908, 917 (Ind. 2017). The question, then, is whether the restrictive covenants in the 2014 employment agreement were in effect at the time the defendant resigned.

#### A.    The Parties' Arguments

The defendant contends that the December 2018 letter "replaced the terms of his previous employment with Hribar Transport, including the non-compete provision within the 2014 Employment Agreement." Dkt. No. 47 at 11. He argues that because the December 2018 letter was on Hribar Logistics letterhead, it represented an offer of employment from Hribar Logistics and necessarily could not be an extension of his contract with Hribar Transport. Id. In support, the defendant cites Hart v. Scherin-Plough Corp., 253 F.3d 272,

8

275 (7th Cir. 2001), where an employee sought severance pay under an employment contract that had expired two years prior. Id. at 11–12. The defendant recounts that the Seventh Circuit held the employee's continued employment after the end of the employment agreement "was governed by new terms" that did not include the severance pay provision. Id. at 12 (quoting Hart, 253 F.3d at 275). The defendant argues that Hart is analogous to his situation, and that the December 2018 letter contained the sole terms of his "new" employment with Hribar Logistics. Id.

The defendant maintains that this result is supported by the text of the December 2018 letter, which does not state that it is an extension of the 2014 employment agreement. Id. He asserts that Hribar Logistics could not extend the 2014 employment agreement between the plaintiff and the defendant because Hribar Logistics is a "completely separate business entity" from the plaintiff. Id. The defendant also contends that the parties "behaved as if there was no non-compete agreement in place," because in early 2019, the plaintiff tried to have the defendant sign a new, stand-alone noncompete. Id. The defendant argues that his offboarding showed that the plaintiff did not believe the noncompete from the 2014 employment agreement was in force, because at his exit interview human resources stated that "there's no employment agreement" and "[t]here's no non-compete signed." Id. at 13.

The plaintiff responds that the expiration of the 2014 employment agreement by its terms on January 1, 2019 began the defendant's two-year restrictive covenant period. Dkt. No. 55 at 16. The plaintiff points to the text of the 2014 employment agreement, which states that the restrictive covenants apply "during the term of the Employment Agreement and for a period of two (2) years thereafter." Id. (quoting Dkt. No. 44-5 at ¶8(a)). As additional support

for its position, the plaintiff cites the agreement's survival clause, which states that "[t]he respective rights and obligations of the parties hereunder shall survive any termination of this Agreement." Id. (quoting Dkt. No. 44-5 at ¶14). The plaintiff argues that the December 2018 letter did not contain an integration clause or other language demonstrating that it was "replacing, superseding or otherwise terminating any of the provisions of the 2014 Employment Agreement;" it asserts that the letter merely changed the defendant's salary and benefits. Id. The plaintiff distinguishes Hart, asserting that the severance provision at issue in that case contained no applicable survival language, in contrast to the 2014 employment agreement in this case, which contains a survival clause. Id. at 17 (citing Hart, 253 F.3d at 276).

In the alternative, the plaintiff argues that the December 2018 letter extended the 2014 employment agreement. Id. It recounts that the 2014 employment agreement allowed for an extension "upon mutual written agreement of the parties." Id. (quoting Dkt. No. 44-5 at ¶2). The plaintiff contends that the December 2018 letter, which references changes in the defendant's salary and benefits, "unambiguously reads as a continuation" of the prior agreement. Id. The plaintiff argues that if the letter was intended to replace the prior agreement entirely, "it would have specified all of its material terms, not just the changes in salary and benefit payments," and it would have contained a clause explicitly superseding the parties' prior agreements. Id. at 18–19.

The plaintiff also argues that the defendant remained the plaintiff's employee after the December 2018 letter. Id. at 19. It says that he performed the same duties before and after the letter, and that his 2019 W-2 was issued by the plaintiff, not Hribar Logistics (though Hribar Logistics did process his

10

payroll). Id. The plaintiff likens this situation to a case where an employee sought to avoid enforcement of his restrictive covenant by a successor employer even though he "continue[d] to accept the benefits of his agreement without objection." Id. at 20–21 (quoting Peters v. Davidson, Inc., 359 N.E.2d 556, 562 (Ind. App. 1977)).

The plaintiff contends that the parties' understanding, or misunderstanding, of the terms and existence of the defendant's contract does not control over the contract itself. Id. The plaintiff also emphasizes that the defendant informed certain customers that he was bound to a noncompete after his employment with the plaintiff ended. Id. at 21.

In his combined opposition and reply brief, the defendant argues that the December 2018 letter does not contain any language referencing an "extension" of the 2014 employment agreement, and he reiterates that the letter could not constitute an extension because the parties were different: Hribar Logistics was a party to the December 2018 letter, but not the 2014 employment agreement. Dkt. No. 65 at 5. The defendant argues that he was given new job duties related to brokerage, and the plaintiff has no broker authority, further supporting his argument that the 2018 letter represented a change in employer from the plaintiff to Hribar Logistics. Id. at 8.

In the plaintiff's reply brief, it reiterates its arguments from its brief in support of summary judgment, in which it argued that the December 2018 letter was an extension of the defendant's employment agreement. Dkt. No. 70 at 5–6. The plaintiff also argues that the defendant remained the plaintiff's employee after the December 2018 letter as evidenced by his 2019 W-2, which was issued by the plaintiff. Id. at 7. The plaintiff disputes the relevance of deposition testimony from the defendant and other employees suggesting that

11

they believed no noncompete was in place, arguing that subjective understanding cannot control over the terms of the contract itself. Id. at 7–8.

B.    <u>Analysis</u>

1.    *Extinguishment*

The December 2018 letter did not supersede the terms of the 2014 employment agreement. This case is analogous to one addressed by the Northern District of Indiana, where the defendant also argued that a subsequent offer letter superseded the terms of a prior employment agreement. <u>Hunting Energy Servs., Inc. v. Kavadas</u>, Case No. 15-CV-228, 2018 WL 4539818, at *16–17 (N.D. Ind. Sept. 20, 2018). Under Indiana law, "a written contract merges all prior and contemporaneous negotiations in reference to the same subject." <u>Buschman v. ADS Corp.</u>, 782 N.E.2d 423, 429 (Ind. Ct. App. 2003). But the offer letter in <u>Kavadas</u> addressed only the scope of the defendant's job duties and his compensation, while the prior employment agreement contained a noncompete provision, among other terms relating to the defendant's employment. 2018 WL 4539818, at *16–17. The <u>Kavadas</u> court found that because the two agreements did not address identical subject matter, and "[w]ithout any provision in the 2013 offer letter stating that it supersedes the 2009 agreement, the 2009 agreement remains in effect." <u>Id.</u> at *18.

The same reasoning applies here. The December 2018 letter addresses only the defendant's compensation and benefits. Dkt. No. 44-7. In contrast, the 2014 employment agreement addresses the defendant's employment term and job duties and contains restrictive covenants, in addition to addressing the defendant's compensation and benefits. Dkt. No. 44-5. Because the two

12

documents address "different subject matters," the latter cannot supersede the former. Kavadas, 2018 WL 4539818, at *18.

The December 2018 letter also cannot supersede the 2014 employment agreement because the two documents involve different parties. The parties to the 2014 employment agreement are the plaintiff, Hribar Transport, LLC and defendant Michael Slegers. Dkt. No. 44-5 at 1. The December 2018 letter is addressed to Mike Slegers and is printed on Hribar Logistics letterhead. Dkt. No. 44-7. Hribar Transport is not mentioned in the letter. See id. On the face of the letter, the parties to the letter agreement are the defendant and non-party Hribar Logistics. This court already has ruled that Hribar Logistics is not a party or third-party beneficiary to the 2014 employment agreement:

> To construe the noncompete agreement in ¶8 as showing an intent to confer a benefit on Hribar Logistics and Hribar Bros. that it does not mention, or to try to contort the benefit intended to be conferred on "affiliates" and "other businesses" of the plaintiff in ¶3 to force it to encompass the noncompete agreement in ¶8, would contravene Indiana law.

Dkt. No. 53 at 19 (citing Dkt. No. 44-7). The parties do not dispute that the Hribar companies are "separate entities." Dkt. No. 57 ¶34. The parties to the 2014 employment agreement—the defendant and the plaintiff—are not the same parties to the December 2018 letter—the defendant and Hribar Logistics.

Although the plaintiff contends that the defendant remained its employee and never was an employee of Hribar Logistics, the existence of an employer-employee relationship and the identities of the parties to a contract are distinct issues, and only the latter is relevant here. See Kenwal Steel Corp. v. Seyring, 903 N.E.2d 510, 513 (Ind. Ct. App. 2009) (explaining that Indiana courts use a seven-factor test to determine whether an employer-employee relationship exists). The plaintiff provides no answer or explanation as to why the December

13

2018 letter would bear Hribar Logistics' letterhead if it actually came from Hribar Transport, and even if it had provided extrinsic evidence giving such an answer or explanation, the court would not consider such extrinsic evidence to contradict the clear and unambiguous terms of the contract itself. Care Grp. Heart Hosp., LLC v. Sawyer, 93 N.E.3d 745, 756 (Ind. 2018).

To the extent that the defendant argues that the December 2018 contract was a novation of the prior contract, that argument must fail. Under Indiana law, a "novation is a new contract made with the intent to extinguish one already in existence" and "extinguish[es] any claims which existed under the original contract." SSD Control Tech. v. Breakthrough Techs., Inc., 685 N.E.2d 1136, 1137 (Ind. Ct. App. 1997) (quoting Rose Acre Farms, Inc. v. Cone, 492 N.E.2d 61, 68 (Ind. Ct. App.1986)). A novation requires "(1) a valid existing contract, (2) the agreement of all parties to a new contract, (3) a valid new contract, and (4) an extinguishment of the old contract in favor of the new one." Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228, 1233 (Ind. 1994). The new contract must contain "language, either express or implied, which indicates an intention to create a novation, relieve contractual liabilities, substitute parties, or extinguish the old contract." Ashbaugh v. Horvath, 859 N.E.2d 1260, 1265 (Ind. Ct. App. 2007). Otherwise, the court "will not conclude that a party to the first contract has waived its right to sue for breach of the first contract." Id.

As discussed, the parties to the December 2018 letter are different than the parties to the 2014 employment agreement, so the second element of novation is not satisfied. Even if the 2014 employment agreement and the December 2018 letter involved the same parties, there is no "express or implied" language in the December 2018 letter expressing an intent to "extinguish the old contract." Ashbaugh, 859 N.E.2d at 1265; Winkler, 638

N.E.2d at 1233. The December 2018 letter does not mention the 2014 employment agreement. See Dkt. No. 44-7. It contains no merger clause or statement that the letter constitutes the entire agreement of the parties. See id. It only communicates a change in the defendant's salary and benefits. Id. The court cannot conclude that the December 2018 letter shows an intent to extinguish the 2014 employment agreement. No novation occurred.

### 2. *Extension*

Nor did the December 2018 letter extend the 2014 employment agreement. "[W]hen the contract terms are unambiguous . . . we do not go beyond the four corners of the contract to investigate meaning." Sawyer, 93 N.E.3d at 756. "Clear, plain, and unambiguous terms are conclusive" of the parties' intent. Fetz v. Phillips, 591 N.E.2d 644, 647 (Ind. Ct. App. 1992).

Here, the 2014 employment agreement states that "[t]he employment term . . . may be extended upon mutual written agreement of the parties." Dkt. No. 44-5 at ¶2. But as discussed above, the parties to the 2014 employment agreement are not the same as the parties to the December 2018 letter. The December 2018 letter cannot be a "mutual written agreement of the parties" to the 2014 employment agreement if the parties to the 2014 employment agreement did not execute it. Even if the parties had been the same, the December 2018 letter makes no mention of the 2014 employment agreement or the extension provision. See Dkt. No. 44-7. The plain language of the December 2018 letter does not contain any indication that it was intended to extend the 2014 employment agreement.

The language upon which the plaintiff relies—"your salary increase," "you will now be responsible for" and "your continued hard work and dedication to the Company"—does not "unambiguously read" as an extension of the 2014

15

agreement. Dkt. No. 55 at 17 (quoting Dkt. No. 44-7). At most, it lays out the terms of the defendant's future employment with "the Company," a term which is not defined in the letter. There is no basis upon which to read the language of the December 2018 letter as extending the term of the 2014 employment agreement.

### 3. *Survival*

By its terms, the 2014 employment agreement expired on January 1, 2019. But that does not mean that the restrictive covenants in that agreement disappeared overnight. The terms of the 2014 employment agreement state that its restrictive covenants apply "during the term of the Employment Agreement and for a period of two (2) years thereafter." Dkt. No. 44-5 at ¶8. The term of the 2014 employment agreement ended on January 1, 2019. Id. at ¶2. That means the restrictive covenants in that employment agreement applied until January 1, 2021—two years after the contract term ended.

The case cited by the defendant does not change this conclusion. First, Hart deals with Illinois, rather than Indiana, law. Hart, 253 F.3d at 275. Second, the 2014 employment agreement explicitly states that its restrictive covenants last for two years after the expiration of the agreement. Dkt. No. 44-5 at ¶2. In Hart, there was no language indicating that the severance provision of the contract extended beyond the term of the employment agreement. Third, severance payment clauses are different than restrictive covenants. A severance payment is a specified event that occurs at the end of an employee's employment (if provided for in a contract or employer policy). A restrictive covenant, by definition, prohibits the employee from doing something for a period after his employment ends—beyond the term of his employment contract. If the end of a contract term extinguished the employee's post-

16

employment obligations, no restrictive covenant agreement ever would be enforceable. Interpreting the covenant to end at the time the contract ends would lead to an absurd result. A House Mechanics, Inc. v. Massey, 124 N.E.3d 1257, 1263–64 (Ind. Ct. App. 2019) ("[W]e will not interpret a contract in a fashion that achieves an absurd result.").

The defendant's other arguments about the parties' beliefs and behavior and extrinsic evidence from his exit interview cannot contradict the clear and unambiguous language of the contract. "Where the terms of a contract are clear and unambiguous, they are conclusive and we will not construe the contract or consider extrinsic evidence but merely apply the contractual provisions." Eckart v. Davis, 631 N.E.2d 494, 497 (Ind. Ct. App. 1994).

The restrictive covenants in the 2014 employment agreement were not extinguished when the agreement expired on January 1, 2019. The restrictive covenants extended until January 1, 2021.

## IV.    The Standard of Reasonableness Applicable to the Restrictive Covenants

Having established that the defendant was subject to the restrictive covenants in the 2014 employment agreement when he resigned in August 2019, the court must consider whether those covenants are enforceable. The covenants must be "reasonable" as a matter of law. Krueger, 882 N.E.2d at 729. The applicable standard of reasonableness differs based on whether the restrictive covenant was executed as part of an employment agreement or whether it was ancillary to the sale of a business. Fogle v. Shah, 539 N.E.2d 500, 501–02 (Ind. Ct. App. 1989). "[C]ovenants involved in the sale of a business are not as ill-favored at law as are employee covenants" because "there is more likely to be equal bargaining power between the parties" in the

17

sale of business context. Id. (quoting Alexander & Alexander, Inc. v. Danahy, 488 N.E.2d 22, 28 (Mass. App. 1986)).

The parties dispute whether the 2014 employment agreement was ancillary to the defendant's sale of MCS Trucking to Amston Supply in December 2011. The court finds that it was not.

A.    The Parties' Arguments

The plaintiff argues that the 2014 employment agreement was "ancillary to" the defendant's 2011 sale of MCS Transport to its affiliate Amston Supply. Dkt. No. 55 at 23. It contends that the defendant entered into "substantially similar restrictive covenants" in the asset purchase agreement and subsequent employment agreements. Id. The plaintiff argues that the employment agreements "protect the same interests" as the asset purchase agreement, such that the 2014 employment agreement "remains ancillary to the underlying sale." Id. at 25. The plaintiff points to the use of the word "Buyer" in the 2014 employment agreement as a "scrivener's mistake" that "highlights the covenant's continued tie-in" to the sale. Id.

In his combined opposition and reply brief, the defendant argues that the restrictive covenants are not ancillary to the sale of MCS Trucking. Dkt. No. 65 at 11. The defendant argues that the initial 2011 employment agreement, executed at the same time as the asset purchase agreement, contained references to the sale and listed transitioning customer relationships from MCS Trucking to the plaintiff as part of the defendant's job duties. Id. But that employment agreement expired on December 8, 2012 and the defendant contends that the parties did not extend it; they entered into a new agreement in February 2013. Id. at 12 (citing Dkt. Nos. 44-2, 44-4). The defendant argues that this pattern repeated, with the parties replacing the 2013 employment

18

agreement with the 2014 employment agreement on January 1, 2014. Id. (citing Dkt. Nos. 44-4, 44-5). The defendant states that the 2014 employment agreement cannot be ancillary to the sale of MCS Trucking because it was executed "over two years" after the sale, and did not contain language referencing the sale or transitioning MCS Trucking customers to the plaintiff. Id. at 12–13. The defendant argues that even if the 2011 employment agreement was ancillary to the sale of MCS Trucking, that agreement was not extended, but was replaced after it expired. Id. at 13.

The defendant cites a case in which an employee executed an employment agreement the same day as a sale of business, then executed a new agreement four years later. Id. at 14–15 (citing AL-KO Axis, Inc. v. Revelino, Case No. 13-CV-1002, 2013 WL 12309288, at *5 (N.D. Ind. Oct. 25, 2013)). The defendant states that the Revelino court found that the second agreement was not ancillary to the sale of the business because of the passage of time and the contents of the agreement, which suggested that the parties' bargaining positions had changed to that of a normal employer-employee relationship. Id. at 15 (citing Revelino, 2013 WL 12309288, at *5). The defendant argues that the same result is compelled here. Id.

In its reply brief, the plaintiff asserts that the 2014 employment agreement is ancillary to the sale of MCS Trucking because it contains the same restrictive covenant terms that were in the asset purchase agreement and in prior employment agreements. Dkt. No. 70 at 9. The plaintiff distinguishes Revelino, arguing that there, the subsequent employment agreement contained materially different terms illustrating the "lack of equal bargaining power" of an employer-employee relationship, rather than the equal bargaining power present in a sale of business transaction. Id. at 10–11 (quoting Revelino, 2013

19

WL 12309288, at *5). The plaintiff argues that because the terms of the 2014 employment agreement are materially the same as the terms of the defendant's original employment agreement, the 2014 agreement does not reflect a change in the parties' bargaining positions and Revelino is inapposite. Id. at 11.

B.    Analysis

The 2014 employment agreement is not ancillary to the sale of MCS Trucking to Amston Supply. The 2014 agreement was executed a little over two years after the December 2011 sale. Dkt. No. 44-5 at 1. The parties executed two prior employment agreements, one in 2011 (executed at the same time as the sale) and one in 2013. Dkt. Nos. 44-2, 44-4. Comparing the 2011 employment agreement to the 2014 employment agreement, it is difficult to see how the 2014 employment agreement is connected to the 2011 sale of the business. The 2014 employment agreement does not mention the sale or MCS Trucking, while the 2011 employment agreement referenced the defendant's duty to transition MCS Trucking customers to the plaintiff. Compare Dkt. No. 44-5 (no reference to MCS Trucking) with Dkt. No. 44-2 at ¶3 (employee's duties will include "transitioning the customer base of MCS Trucking, Inc. to the Company and servicing such customers"). The 2011 agreement directly refers to the asset purchase agreement. Dkt. No. 44-2 at ¶¶1(b), 5. The 2014 agreement does not. See Dkt. No. 44-5. The 2014 agreement also removed an indemnity provision related to the sale of the business. Compare Dkt. No. 44-2 at ¶5 with Dkt. No. 44-5.

This case is analogous to Revelino. 2013 WL 12309288, at *5. There, the parties also executed one employment agreement at the same time as the sale of the business, and another agreement several years later. Id. Even though the restrictive covenants in both contracts were "materially the same," the Revelino

20

court held that the later agreement was not connected to the sale of the business. Id. This reasoning is bolstered by Bus. Recs. Corp. v. Lueth, 981 F.2d 957 (7th Cir. 1992), in which the Seventh Circuit stated in dicta that if a restrictive covenant prohibited competitive activity several years beyond the actual sale of the business, "by that time [the buyer's] need to protect its purchase would be long gone." Lueth, 981 F.2d at 960 ("The aspect of the covenant that relates to the period after the date of purchase obviously relates to protection of the buyer. . . . [T]he part that bars competition for two years after the date of quitting sounds more like a provision to protect an employer from a renegade employee than one to protect a purchaser.")

The defendant's 2014 employment agreement was executed two years after the sale of MCS Trucking, and it prohibits competitive activity for two years beyond the January 1, 2019 expiration of the agreement. Dkt. No. 44-5 at ¶¶2, 8. That means that the defendant's restrictions expired nearly ten years after the sale of MCS Trucking. That "sounds more like a provision to protect an employer from a renegade employee than one to protect a purchaser." Lueth, 981 F.2d at 960. The court will use the standard of reasonableness applicable to restrictive covenants contained in employment agreements.

## V.    The Reasonableness of the Restrictive Covenants

Next, the court considers whether the restrictive covenants are reasonable and enforceable. The plaintiff "must first show that it has a legitimate interest to be protected by the agreement," such as customer goodwill. Krueger, 882 N.E.2d at 729. The plaintiff "also bears the burden of establishing that the agreement is reasonable in scope as to the time, activity, and geographic area restricted." Id. If the covenants are unreasonable, the court may be able to "blue pencil" (edit) the agreement. Heraeus Med., LLC v.

Zimmer, Inc., 135 N.E.3d 150, 155–56 (Ind. 2019). "A court can blue-pencil unreasonable provisions from a restrictive covenant if the covenant is clearly divisible into parts and if a reasonable restriction remains to be enforced after the unreasonable portions have been eliminated." Id. The court may only "delete, but not add, language to revise unreasonable restrictive covenants." Id. at 156.

The 2014 employment agreement states that during the term of the agreement and for two years thereafter, the defendant will not:

> (1) acquire an ownership interest in, work for, render advice or assistance to or otherwise engage in or enter into any aspects of the business of any 'Competitor' (as defined below);
>
> (2) Contact, solicit or entice, or attempt to contact, solicit or entice, any 'Customer' of the Business so as to cause, or attempt to cause, any of said Customers not to do business with the Buyer or to purchase services sold by the Buyer from any source other than the Buyer; or
>
> (3) perform any trucking, hauling or transportation services for a Customer.
> . . . .
>
> For purposes of this Paragraph 7(a) [sic], the term "Competitor" shall mean any business, incorporated or otherwise, which provides trucking services in the states of Indiana, Illinois, Wisconsin, Michigan, Ohio, Tennessee, Pennsylvania, New York, West Virginia and Missouri, and the term "Customer" shall mean those persons or entities to whom Employee or the Company provided services during the term of the Employment Agreement.

Dkt. No. 44-5 at ¶8(a). The parties agree that the plaintiff has a legitimate protectable interest in its customer goodwill. Dkt. Nos. 47 at 15; 55 at 26. Indiana courts agree (and the parties do not dispute) that the two-year time frame of the restrictive covenants is reasonable. Krueger, 882 N.E.2d at 729 (accepting two years as reasonable). The issue for this court is the

22

reasonableness of the scope of activities and geographic area restricted by the covenants.

There are three covenants at issue: (1) a noncompete clause, (2) a customer non-solicitation clause and (3) a customer non-service clause. Dkt. No. 44-5 ¶¶8(a)(1)–(3). The court concludes that none of them are reasonable, and that the court cannot blue pencil the agreements to make them reasonable. The restrictive covenants are unenforceable.

    A.    <u>The Parties' Arguments</u>

The defendant argues that "all three restrictions are unreasonable." Dkt. No. 47 at 14. He argues that the noncompete restriction is overbroad because it "does not limit the scope of prohibited activity—it prohibits [the defendant] from working in ***any capacity*** for any business that provides trucking services in eleven states." <u>Id.</u> (emphasis in original). The defendant contends that restrictions preventing an employee from working in any capacity for a competitor are "unreasonable." <u>Id.</u> at 16. The defendant cites two Indiana cases that he contends invalidated similar noncompetes due to overbreadth. <u>Id.</u> at 15 (citing <u>Gleeson v. Preferred Sourcing</u>, 883 N.E.2d 164, 175 (Ind. Ct. App. 2008); <u>MacGill v. Reid</u>, 850 N.E.2d 926 (Ind. Ct. App. 2006)).

The defendant argues that the customer non-solicitation restriction is overbroad due to the scope of customers that he is prohibited from soliciting. <u>Id.</u> at 16. The provision prohibits the defendant from soliciting customers "to whom Employee or the Company provided services during the term of the Employment Agreement." <u>Id.</u> (quoting Dkt. No. 44-5 at ¶8(a)). The defendant believes this scope should be limited to customers with whom he had contact during his employment. <u>Id.</u> He cites two cases in which courts declined to enforce non-solicitation restrictions extending to "past" customers of the former

23

employer. Id. at 16–17 (citing Clark's Sales & Service, Inc. v. Smith, 4 N.E.3d 772, 783 (Ind. Ct. App. 2014); Seach v. Richards, Dieterle & Co., 439 N.E.2d 208, 213 (Ind. Ct. App. 1982)). The defendant also takes issue with the use of two undefined terms in the non-solicitation restriction—"Business" and "Buyer"—and says that this ambiguity makes the provision unenforceable. Id. at 17.

The defendant argues that the non-service provision is unreasonable because the restricted activities are overbroad (as, he asserts, is the noncompete provision), and it incorporates the same problematic definition of "Customer" as the non-solicitation provision. Id. at 18. He argues that the non-service provision also does not define "transportation services," which the defendant contends creates an "ambiguity." Id. The defendant opines that it is unclear whether freight brokerage services are encompassed in this provision; if they are, he argues that the plaintiff has no legitimate interest in prohibiting him from performing those services because the plaintiff is not a freight broker. Id.

Finally, the defendant argues that the court cannot use the blue pencil doctrine to revise any of the provisions to make them reasonable. Id. The defendant states that under Indiana law, the court can strike only those unreasonable terms that are divisible from the rest of the covenant. Id. at 18–19 (quoting Clark's Sales, 4 N.E.3d. at 783–84). The defendant argues that the restrictions at issue here are "indiscrete whole provisions" that cannot be separated and revised. Id. at 19. He contends that the only way to make the covenants reasonable is to "creat[e] a new agreement" out of whole cloth, which is impermissible. Id.

24

The plaintiff responds that the noncompete's geographic reach is reasonable and necessary to protect its customer goodwill because its customer base and operations expand across multiple states. Dkt. No. 55 at 28. The eleven states are those where the defendant and the plaintiff "performed services." Id. at 29. The plaintiff contends that these states are where the defendant "played a major substantive role for well over a decade" of his employment and where his customer contacts were located. Id. The plaintiff points to the defendant's post-employment move to Florida as evidence that he could have competed in that state instead of in the prohibited territory. Id. at 30.

The plaintiff also argues that the noncompete restriction does not prohibit the defendant from working for a competitor in "any capacity." Id. at 29. According to the plaintiff, "[l]ogically, the only capacity in which [the defendant] would act is in the capacity in which he acted for MCS Trucking and then [the plaintiff]—the arranging for trucking services." Id.

The plaintiff argues that the defendant acknowledged the reasonableness of the covenants in the 2014 employment agreement. Id. at 30 (quoting Dkt. No. 44-5 at ¶8(b)). It maintains that the established customer relationships the defendant had with customers through his prior company makes the restrictions all the more reasonable, because he had "substantive relationships" with the plaintiff's customers, including the customers whose goodwill the plaintiff purchased from the defendant. Id. The plaintiff also distinguishes the caselaw cited by the defendant, contending that the covenants at issue in MacGill and Gleeson were much broader than the defendant's. Id. at 31 (citing Gleeson, 883 N.E.2d at 164; MacGill, 850 N.E.2d

at 926). The plaintiff says that the defendant's covenant is "limited by material states and customers." Id. at 31.

As to the non-solicitation provision, the plaintiff argues that it does not prohibit the defendant from contacting "customers with which he had no contact while with Hribar." Id. at 32. The plaintiff contends that the clause applies only to customers "with whom [the defendant] was familiar," distinguishing the clause from the one in Clark's Sales. Id. (citing Clark's Sales, 4 N.E.2d at 781–82). The plaintiff argues that the terms "Buyer" and "Business" are not ambiguous because they were defined in the 2011 asset purchase agreement through which Amston Supply purchased the defendant's business. Id. at 32–33.

As to the non-service provision, the plaintiff argues that "every customer for which [the defendant] acted in violation of this restriction was a [defendant's] customer at MCS Transport and/or [the plaintff]," making the restriction reasonable as applied. Id. at 33. The plaintiff argues that even though it is not a freight broker, by performing brokerage services for a competitor, the defendant arranged for a competitor to perform the same trucking services that the plaintiff performs in violation of this provision. Id.

The plaintiff argues that the restrictive covenants are not unduly burdensome on the defendant, because he will be required only to "create his own customer base, independent of [the plaintiff's] customers." Id. at 34. The plaintiff argues that the public interest favors enforcing the covenant, because it allows for a "level playing field" of competition. Id.

Even though the plaintiff contends the restrictive covenants are enforceable, it also argues that the covenants could be modified if the court finds them unreasonable. Id. at 35. According to the plaintiff, the noncompete,

non-solicit and non-service provisions are "clearly separated into parts" and the court could enforce one and not the others if necessary. Id.

In his combined opposition and reply brief, the defendant contends that all the plaintiff's arguments in favor of the reasonableness of the covenants are an "attempt to narrow each restriction by interpretation, rather than by applying the restriction as written." Dkt. No. 65 at 15. The defendant reiterates his arguments from his opening brief and argues that each restriction, as written, is unreasonable based on Indiana law. Id. at 16–19. The defendant also argues that his acknowledgment of reasonableness in the 2014 employment agreement is not binding or dispositive as to whether the covenant actually is reasonable. Id. at 19–20. He reiterates that the court cannot blue-pencil the agreement because it is not clearly divisible into parts. Id. at 20. He adds that the plaintiff has not given the court any guidance on how to revise the covenants, and he asserts that the plaintiff should not be allowed another chance at a reasonable restriction via the court's editing. Id.

In reply, the plaintiff reiterates the reasonableness arguments from its opening brief. Dkt. No. 70 at 11–13. Specifically, the plaintiff argues that the covenants are reasonable as applied to the facts of the case, because "[t]here is only one job [the defendant] would or could have for any competitor, and that is the same job he had for [the plaintiff]." Id. at 12. The plaintiff reiterates that even though the restrictions are reasonable, the court can blue-pencil the "offending" portion without rewriting the agreement entirely. Id. at 14.

B. <u>Analysis</u>

1. *The Non-Compete*

The scope of activities prohibited by the noncompete is unreasonably broad. Indiana courts repeatedly have declined to enforce non-compete

27

restrictions that attempt to prohibit an employee from working "in any capacity for a competitor." Gleeson, 883 N.E.2d at 175; MacGill, 850 N.E.2d at 932 (collecting cases). That is because such restrictions "extend beyond the scope of the employer's legitimate interests" and thus are unreasonable. Gleeson, 883 N.E.2d at 175.

The defendant's noncompete states that he may not "acquire an ownership interest in, work for, render advice or assistance to or otherwise engage in or enter into any aspects of the business of any 'Competitor.'" Dkt. No. 44-5 at ¶8(a)(1). This language prohibits the defendant from working for a "competitor" in any capacity. The defendant could breach this noncompete by working in a role that does not involve customer solicitation or service, for instance as a janitor. This restriction, like those in Gleeson and MacGill, extends beyond the scope of the plaintiff's legitimate interest in protecting its customer relationships and goodwill. Gleeson, 883 N.E.2d at 175 (covenant prohibiting employee from participating in "any business . . . which directly or indirectly competes" with the employer was unreasonable); MacGill, 850 N.E.2d at 932 (covenant prohibiting employee from "owning, managing, or materially participating in any business substantially similar to" the employer was unreasonable).

The plaintiff asserts that the noncompete prohibits the defendant only from working "in the capacity in which he acted for MCS Trucking and then [the plaintiff]," but that is not what the covenant says. Dkt. No. 55 at 29. The plaintiff could have drafted the covenant to prohibit the defendant from performing the same or similar services for a competitor that he performed for the plaintiff, but it did not. The plaintiff drafted a covenant that prohibits the defendant from working in "any aspects of the business of any 'Competitor.'"

28

Dkt. No. 44-5 at ¶8(a)(1). The plaintiff's narrower reading is not supported by the plain text of the contract. The covenant must be interpreted as written. Licocci v. Cardinal Assocs., Inc., 445 N.E.2d 556, 561 (Ind. 1983) ("[I]f the covenant as written is not reasonable, the courts may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made."). The defendant's acknowledgment of reasonableness in the contract cannot override the text of the agreement. See Mercho-Roushdi-Shoemaker-Dilley Thoraco-Vascular Corp. v. Blatchford, 900 N.E.2d 786, 790, 799 (Ind. Ct. App. 2009) (finding noncompete unenforceable despite defendant's contractual acknowledgment of reasonableness). The noncompete is unreasonable and unenforceable as written.[2]

The court cannot blue pencil the noncompete into reasonableness. The court may only strike language, not add language or edit the provision beyond that. Heraeus Med., 135 N.E.3d at 156. The covenant prohibits the defendant from entering into "any aspects of the business of any 'Competitor.'" Dkt. No. 44-5 at ¶8(a)(1). Striking "any aspects of" would not remedy the overbreadth. The provision then would read that the defendant is prohibited from entering into "the business of any 'Competitor,'" which is similarly overbroad and unenforceable. There is no way to blue pencil the noncompete into reasonableness. The court will not enforce it.

_____

[2] The defendant alleges that the geographic restriction in the noncompete is also overbroad but does not cite any authority specifically addressing the geographic restriction. The plaintiff argues that the geographic scope is reasonably related to the areas where the defendant had developed customer relationships, which the defendant does not dispute. Either way, the court need not reach the reasonableness of the geographic restriction, because the scope of activity prohibited by the noncompete is unreasonable.

## 2. *The Customer Non-Solicit*

The scope of activities prohibited by the defendant's customer non-solicitation agreement also is unreasonably broad. Indiana courts require that customer non-solicitation agreements be limited to customers with which the former employee actually had contact during his employment. Clark's Sales, 4 N.E.3d at 781–82 (declining to enforce customer non-solicitation agreement that "applie[d] to all customers of Clark's during the term of Smith's employment and applie[d] regardless of whether Smith had any contact whatsoever with those customers"); Seach, 439 N.E.2d at 214 ("The contract prohibits contact with all past or prospective customers of the Firm, no matter how much time has elapsed since their patronage ceased or the contact was made. This restraint is vague and too broad."); Custom Truck One Source, Inc. v. Norris, Case No. 22-CV-00046, 2022 WL 594142, at *8 (N.D. Ind. Feb. 28, 2022) (provision that applied to "any customers" of the employer in the last twelve months of the employee's employment "and was not limited to customers with whom [he] had contact" was overbroad).

The customer non-solicitation agreement here poses similar issues as the one in Clark's Sales, 4 N.E.3d at 781–82. There, the restriction prohibited the employee from soliciting anyone who was a customer during his fourteen-year employment, regardless of whether the employee had had contact with that customer or whether the customer was a current customer of the employer. Id. at 781. The court held that this agreement was vague and too broad to enforce. Id. at 782. Here, the defendant's customer non-solicitation agreement similarly defines "customer" as "those persons or entities to whom Employee or the Company provided services during the term of the Employment Agreement." Dkt. No. 44-5 at ¶8(a). The employment agreement covered five years of the

30

defendant's employment with the plaintiff. Id. at ¶2. It is unreasonable to prohibit the defendant from soliciting customers that did business with the plaintiff five years prior, with whom he had no contact. The defendant may not even know that a particular customer once was a customer of the plaintiff, and he could violate his agreement without realizing it.

Further complicating the issue is the use of the undefined words "Buyer" and "Business" in the customer non-solicitation agreement. Dkt. No. 44-5 at ¶8(a)(2). The contract states that the defendant may not "[c]ontact, solicit or entice, or attempt to contact, solicit or entice, any 'Customer' of the Business so as to cause, or attempt to cause, any of said Customers not to do business with the Buyer." Id. The plaintiff argues that the defendant would have known that these terms carried the same meaning as they did in the 2011 asset purchase agreement. Dkt. No. 55 at 33. But there, "Buyer" was defined as the plaintiff's affiliate, Amston Supply, Inc., and "Business" was defined as the business of SWI Leasing, Inc. and MCS Trucking, Inc. Dkt. No. 44-1 at 3. If these definitions apply to the 2014 employment agreement, that muddies the waters further. The defendant would be prohibited from contacting or soliciting customers of two businesses that no longer exist (SWI Leasing and MCS Trucking) in an attempt to cause those not to do business with Amston Supply, not the plaintiff or the plaintiff's other affiliates.

The plaintiff again tries to salvage the provision by narrowing the text. The plaintiff states that every "customer *at issue*" is "a customer with whom [the defendant] was familiar." Dkt. No. 55 at 32 (emphasis added). It does not matter that the plaintiff is seeking damages related only to customers with whom the defendant had contact. The language of the contract provision extends well beyond such customers and is impermissibly vague.

31

The customer non-solicitation provision also cannot be blue penciled. Striking the undefined words "Buyer" and "Business" would make the provision nonsensical; it would prohibit the defendant from soliciting "any Customer so as to cause, or attempt to cause, any of said Customers not to do business." Dkt. No. 44-5 at ¶8(a)(2). Editing the definition of "customer" to include only "those persons or entities to whom Employee provided services" would remedy some of the overbreadth, but still would leave the defendant with five years of customers he cannot solicit, whether or not they are current customers of the plaintiff. Id. at ¶8(a). Blue penciling cannot save the provision and the court will not enforce it.

        3.    *The Non-Service*

The non-service covenant suffers from similar problems as the other two covenants. The provision states that the defendant may not "[p]erform any trucking, hauling or transportation services for a Customer." Dkt. No. 44-5 at ¶8(a)(3). Although in this provision the scope of activity is limited to "trucking, hauling or transportation services," those terms are not defined and are susceptible to multiple interpretations. As the defendant asks, do "transportation services" include brokering freight? Dkt. No. 47 at 18. It is unclear from the face of the contract. "Transportation services" could encompass multiple forms of transportation in which the plaintiff does not engage, such as passenger transportation. Prohibiting the defendant from engaging in *any* kind of transportation services goes beyond the scope of the plaintiff's protectable interest in its freight customers.

The non-service covenant also incorporates the same problematic definition of "customer" found in the customer non-solicitation provision. Dkt. No. 44-5 at ¶8(a). As discussed in the prior section, that provision has multiple

flaws that make it overbroad and impermissibly vague. The non-service covenant is unreasonable as written.

As with the other two covenants, the court cannot blue pencil the non-service covenant. As discussed above, the customer definition is problematic and cannot be revised merely by striking terms. The court cannot add terms via blue penciling, so "trucking services" would remain undefined and unclear. The non-service covenant is unenforceable.

Because each of the restrictive covenants is unreasonable and cannot be blue penciled, the court will not enforce them. The plaintiff cannot prove the existence of an enforceable contract, an essential element of its breach of contract claim. The court will grant summary judgment in favor of the defendant.

## VI. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 40.

The court **DENIES** the plaintiff's motion for partial summary judgment. Dkt. No. 54.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 30th day of September, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

33